[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 474.]

THE STATE OF OHIO, APPELLEE, *v.* LUNDGREN, APPELLANT.

[Cite as *State v. Lundgren*, 1995-Ohio-227.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 93-2179—Submitted March 7, 1995—Decided August 30, 1995.)

Appeal from the Court of Appeals for Lake County, Nos. 90-L-15-140 and

91-L-036.

———————————

{¶ 1} In August 1990, a Lake County jury found cult leader Jeffrey Lundgren guilty of the kidnapping and murder of five of his followers, all members of the Avery family. The following summarizes the facts most relevant on appeal.

*Lundgren's Background*

{¶ 2} Lundgren was born in Missouri and raised in the Reorganized Church of Jesus Christ of Latter Day Saints ("RLDS"). While attending college, Lundgren met and married his wife, Alice. Unsuccessful in school, Lundgren joined the Navy and served in the Vietnam War in the early 1970s. After his honorable discharge in 1974, he unsuccessfully held a series of hospital maintenance and other jobs in Missouri.

{¶ 3} Lundgren's religious beliefs form the foundation of this case. Although the RLDS, headquartered in Independence, Missouri, differs from the Utah-based Mormon Church, both religions trace their origins back to the prophet Joseph Smith, Jr., who published the Book of Mormon in 1830. During the 1830s, Smith moved to Kirtland, Ohio, and built the Kirtland Temple, now managed by the RLDS.

{¶ 4} In summer 1984, Lundgren and his family moved from Missouri to Kirtland so that Lundgren could serve as senior temple guide, a job that had no pay but did include family lodging. Lundgren initially attracted favorable attention in

his Sunday school classes and as a guide. William Russell, a religion professor at an RLDS college, testified that Lundgren knew scripture exceptionally well, especially the Book of Mormon, and followed the chiastic method of scripture interpretation, which involves searching text for recurring patterns. However, Lundgren did not understand the Bible's historical context and tended to concentrate on this esoteric method. Lundgren generally fit within the traditions of the RLDS faith in that he described visions, direct spiritual experiences, and God speaking directly to prophets.

{¶ 5} Over the next three years, Lundgren served as a temple guide and taught classes on the Bible and the Book of Mormon. Despite the church's direction to turn over all money received from temple visitors to the church, Lundgren solicited and kept contributions received from visitors. Temple contributions dropped dramatically, and the temple bookstore also suffered fund shortages. The church eventually removed Lundgren as a religion teacher and, in October 1987, fired him as a temple guide and evicted him from his quarters next to the temple.

*The Cult*

{¶ 6} From 1985 on, Lundgren attracted a substantial following in his classes because of his knowledge of religious texts. Eventually, Kevin Currie and Sharon Bluntschly moved in with the Lundgrens, as did Richard Brand, Daniel Kraft, and Gregory Winship. Debbie Olivarez joined the group in April 1988. Those living with the Lundgrens called him "Dad" and contributed their paychecks and other money for common group expenses. Two couples, Ron and Susan Luff and Dennis and Tonya Patrick, also contributed money, but did not live with the Lundgrens. In the spring of 1987, the Avery family moved from Missouri to follow Lundgren's teachings. The Avery family included Dennis, age 49; Cheryl, age 46; and their daughters, Trina, age 15; Rebecca, age 13; and Karen, age 7.

{¶ 7} After Lundgren's eviction, he and his family and followers moved to a rented farmhouse. There, Lundgren continued his classes, stressing the

2

importance of the Kirtland Temple. According to Lundgren, his followers had to recapture the temple, an earthquake would elevate it, and Christ would return and establish Zion. Lundgren also spoke of his conversations with God and his visions. He discussed the Book of Revelations and the Book of Mormon, and referred to "pruning the vineyard" and the need to kill ten followers before Zion could be created. Eventually, the men in the group undertook paramilitary training to prepare for a temple assault. Lundgren picked May 3, 1988 (his birthday) as the day to recapture the temple, but later decided it was not yet time. The Averys, on the fringe of the group, were invited to only a few of Lundgren's prayer meetings.

{¶ 8} By October 1988, the RLDS church had excommunicated Lundgren. In early 1989, Lundgren was stressing the need for his followers to go on a wilderness trip before Zion would be possible. By that time, both Kevin Currie and another follower, Shar Olson, had left the group, but Kathryn and Larry Keith Johnson had joined.

*The Murders*

{¶ 9} In April 1989, at Lundgren's direction, the group began preparing for the wilderness trip. Those who worked left their jobs and some bought provisions. Lundgren encouraged all of the followers to use up any of their available credit cards. All of the group members, including the Averys, gathered their worldly possessions. Around April 12, two or three of the followers secretly began digging a six-by-seven-foot pit in the dirt floor of Lundgren's barn. Lundgren told Cheryl Avery to write and tell her family that they were going to Wyoming. Then, Lundgren invited the Averys to dinner.

{¶ 10} On April 17, 1989, Dennis, Cheryl and their three daughters ate dinner at Lundgren's farmhouse. After dinner, Lundgren went out to the barn with his son, Damon, and four followers, Brand, Kraft, Winship, and Ron Luff. The Averys stayed in the house with the women and children. At Lundgren's direction, Luff individually led each Avery family member out to the barn, where each was

bound and gagged by the men. After the men placed each Avery family member into the pit, Lundgren shot each person two or three times with a .45 caliber semiautomatic weapon. The men then filled the pit with dirt and stones. Afterwards, Lundgren and the others went back to the farmhouse and held a prayer meeting.

*The Months Prior to Lundgren's Arrest*

{¶ 11} The next day, April 18, police officers and FBI agents visited the Lundgren farm to investigate reports about the planned temple assault. Everyone interviewed said that they were at the farm voluntarily and denied knowing anything about plans to assault the temple. The FBI left without arresting anyone, and the group drove away on their wilderness trip.

{¶ 12} Lundgren selected mountain campsites near Davis, West Virginia, and the group lived in tents there through October 1989. Some of the followers took jobs, and the men continued their military exercises. While in West Virginia, Lundgren chose Tonya Patrick as his second wife. That arrangement did not work out, so Lundgren then picked Kathryn Johnson as his second wife. That choice upset Larry Johnson, Kathryn's husband, and contributed to group dissension. By October 1989, Lundgren, his family, and about ten of his followers moved to Missouri. However, more dissension occurred and, by the end of December 1989, Larry Johnson had contacted federal law enforcement authorities about the murders.

{¶ 13} On January 3, 1990, Kirtland police began digging out the pit in the barn and found Dennis Avery's body. Police uncovered the other Avery family members' bodies the next day. Lundgren had shot Dennis twice in the back and Cheryl three times in the torso. He shot Trina once in the head and twice in the body, Rebecca in the back and thigh, and Karen in the head and chest. The coroner found silver duct tape wrapped around the victims' heads, hands, and feet. The origin of two damaged bullets found at the scene was unknown. Police discovered

that a .45 caliber semiautomatic weapon, belonging to Lundgren, had fired all of the other bullets they recovered. Lundgren bought the weapon in 1987 and sold it in West Virginia in October 1989. On January 7, 1990, federal authorities arrested Lundgren in California.

*Lundgren's Conviction and Sentence*

{¶ 14} During his opening statement, Lundgren conceded that he had shot the Avery family. At the close of the trial, the jury found Lundgren guilty of five counts of aggravated murder with each count containing two death penalty specifications. One of the specifications alleged multiple murders and the other alleged a felony-murder kidnapping specification. The jury additionally convicted Lundgren as charged with five kidnapping offenses.

{¶ 15} After further deliberation, the jury recommended the death penalty for each aggravated murder count. The trial court sentenced Lundgren to death on each aggravated murder count and to consecutive terms of imprisonment for each kidnapping offense. The court of appeals affirmed the convictions and the sentences.

{¶ 16} The cause is now before this court upon an appeal as of right.

————————————

*Charles E. Coulson*, Lake County Prosecuting Attorney, and *Ariana E. Tarighati*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Joann M. Jolstad* and *Jane P. Perry*, Assistant Public Defenders, for appellant.

————————————

**COOK, J.**

{¶ 17} Lundgren has presented this court with thirty-two propositions of law concerning both the guilt and sentencing phases of his trial (see Appendix). For the following reasons, we affirm the appeals court's judgment and uphold Lundgren's death sentences.

I

The Guilt Phase

{¶ 18} With his first proposition of law, Lundgren argues that massive pretrial publicity in Lake County necessitated a change of venue. In May 1990, Lundgren moved to change venue, later filed addendums, and then renewed the motion at the conclusion of voir dire. The trial court rejected any venue change. Admittedly, the January 1990 recovery of five bodies from the Kirtland barn resulted in massive, inflammatory, statewide publicity. According to The Plain Dealer, the Lake County Prosecutor publicly asserted that the members of the Lundgren group were the "most inhuman people this county has ever seen, and they are going to die in the electric chair." According to the second addendum, from January through August 9, 1990, the Lake County News Herald printed a total of two hundred twenty-seven Lundgren-related items, including sixty-one front page articles. The Plain Dealer, widely circulated in Lake County, published some one hundred twenty-three articles, including thirty on the front page. In that same period, Cleveland television and radio stations frequently ran news and background stories about the murders. For example, Lundgren asserts that Channel 43 had sixty-six stories, Channel 5 had one hundred twelve stories, and Channel 8 had one hundred sixty-nine stories. Although publicity diminished rapidly after January 1990, media reports concerning the disposition of charges against Lundgren's followers kept the "Kirtland Massacre" case in the public eye.

{¶ 19} In June 1990, Dr. Jack Arbuthnot, a defense psychologist, directed a community survey of some two hundred one Lake County residents who had been called for jury duty in 1989. According to Arbuthnot, all those interviewed knew about the case, and 37.5 percent said they discussed the case a lot. Approximately fifty-seven percent thought Lundgren was definitely guilty, twenty-four percent thought he was probably guilty, and just nineteen percent did not know. On the basis of these and other answers, Arbuthnot concluded that Lundgren would not

receive a fair trial in Lake County. However, in contrast, Dr. Jon Krosnick, a psychologist employed by the state, claimed that the defense psychologist had not conducted or interpreted the survey in a professionally credible manner. He opined that the survey's methodology was flawed, the questions were ambiguous and poorly worded, and the results did not support the asserted conclusions. According to Krosnick, twenty-three percent of prospective jurors had only occasional media exposure, and sixty-three percent discussed the case a little or not at all. Also, at least thirty-nine percent of those surveyed said they could serve as unbiased jurors.

{¶ 20} The crucial issue here is whether the trial court's refusal to change venue violated Lundgren's fair trial rights. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.*** In the language of Lord Coke, a juror must be 'as indifferent as he stands unsworne.'" *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755. In *Irvin* and *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, the Supreme Court reversed murder convictions because prejudicial pretrial publicity had impaired the defendant's fair trial rights. See, also, *Rideau v. Louisiana* (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.

{¶ 21} Lundgren asserts that the pretrial publicity in this case was so pervasive that the trial court should have presumed that prejudice would occur. However, cases of presumed prejudice "are relatively rare. *** [P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683, 694-695. Indifference does not require ignorance. "In these days of swift, widespread and diverse methods of communication, *** scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722, 81 S.Ct. at 1642, 6 L.Ed.2d at 756.

**{¶ 22}** Changes in venue help to protect fair trial rights. A trial court can change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18; R.C. 2901.12(K). However, "'[a] change of venue rests largely in the discretion of the trial court, and *** appellate courts should not disturb the trial court's [venue] ruling *** unless it is clearly shown that the trial court has abused its discretion.'" *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 388-389, 473 N.E.2d 768, 780, quoting *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 243, 289 N.E.2d 352, 355. "'[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 722, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051, death penalty vacated (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155.

**{¶ 23}** While a change of venue may have been prudent in this case, we do not find that the trial court abused its discretion in denying Lundgren's motion. The trial court selected a jury following an extensive eight-day voir dire which included individualized questioning as to the impact of pretrial publicity. The trial court readily excused those in the venire who had formed fixed opinions or were otherwise unsuitable. The jurors selected did not appear to have been excessively exposed to media publicity. Those who said they held views expressed tentative impressions and all of the jurors selected promised to set aside any information received or views held and decide the case only on the evidence offered at trial. Despite the fact that pretrial publicity was extensive, the trial judge was in the best position to judge each juror's demeanor and fairness. Lundgren has not established the rare case in which prejudice is presumed. Thus, we reject the first proposition of law.

**{¶ 24}** We find that Lundgren's second proposition of law similarly lacks merit. In that proposition, Lundgren argues that the trial judge should have granted

him a new trial because the same judge granted Luff, his accomplice, a change of venue even after tentatively choosing twelve jurors. Although Lundgren characterizes his argument as a claim of new evidence, his assertions amount to a reiteration of the arguments we reviewed in the first proposition of law. A trial court's decision to change venue for a codefendant's trial does not satisfy the criteria required to obtain a new trial under Crim.R. 33(A)(6). See *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 152, 76 N.E.2d 370, syllabus. Moreover, Luff's situation is distinguishable from Lundgren's. Luff's venire was directly affected by the publicity that existed during Lundgren's trial, whereas Lundgren's jurors were then under strict instructions to avoid any publicity. Also, no method exists to compare the jury venire in Luff's case with Lundgren's jury. Therefore, Lundgren's claim that no principled distinction exists between the two cases is not well taken.

{¶ 25} In his twenty-eighth proposition of law, Lundgren argues that he was denied a fair trial because the jury venires in his case overrepresented persons who were twenty-five to fifty-four years old and sixty-five to seventy-four years old. He contends that, in a pool of one hundred forty-five potential jurors, only eleven were from ages eighteen to twenty-four and just ten were between the ages of fifty-five and sixty-four. However, "[t]he array of veniremen need not reflect an exact cross section of the community." *State v. Strodes* (1976), 48 Ohio St.2d 113, 115, 2 O.O.3d 271, 272, 357 N.E.2d 375, 377, death penalty vacated (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154. We note that Lundgren does not claim that systematic or intentional exclusion occurred in this case. *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579; *State v. Johnson* (1972), 31 Ohio St.2d 106, 114, 60 O.O.2d 85, 90, 285 N.E.2d 751, 757. Furthermore, Lundgren never raised this issue at trial and thus waived any complaint absent plain error. Crim.R. 24(E); *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, death penalty vacated (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. Thus, we reject proposition of law twenty-eight.

{¶ 26} Several of Lundgren's propositions of law concern different aspects of the voir dire. We will discuss each of these issues in turn.

{¶ 27} In the third proposition of law, Lundgren argues that the trial court unfairly restricted voir dire as to prospective jurors' views about specific mitigating factors. In particular, Lundgren attempted to ask if individual jurors would consider and give weight to each of the statutory mitigating factors found in R.C. 2929.04(B). The trial court ruled that such questions constituted juror "indoctrination," but did allow jurors to be asked generally if they would consider mitigating factors and evidence as instructed.

{¶ 28} Crim.R. 24(A) requires that counsel be given an opportunity to voir dire prospective jurors or to supplement the court's voir dire examination. Accord R.C. 2945.27. However, the scope of voir dire falls within a trial court's discretion and varies with the circumstances. *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920. Accord *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22. Restrictions on voir dire have generally been upheld. See *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 186, 15 OBR 311, 330, 473 N.E.2d 264, 280. Lundgren contends that, given the extensive pretrial publicity in this case, the trial court's limitation on voir dire prevented him from adequately unearthing juror bias and effectively using his peremptory challenges. The cases cited by Lundgren, however, do not involve the limited restriction imposed here.

{¶ 29} In this case, Lundgren had full opportunity to question all of the prospective jurors during the eight-day voir dire and individually ask them about their media exposure and their attitudes about the death penalty. Lundgren argues that the potential jurors could not meaningfully say whether they would properly consider and weigh the statutory mitigating factors without knowing what the factors were. However, weighing aggravating circumstances against mitigating factors is a complex process. Jurors weigh mitigating factors together, not singly,

and do so collectively as a jury in the context of a penalty hearing. Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law. Moreover, "evidence of an offender's history, background and character" that is not found to be mitigating "need be given little or no weight against the aggravating circumstances." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus. We find that the trial court exercised appropriate discretion in not allowing jurors to be asked if they would consider specifically named mitigating factors. The third proposition of law lacks merit.

{¶ 30} In his fourth proposition of law, Lundgren challenges the trial court's death penalty qualification process, asserting that the court's questions predisposed the jurors toward the death penalty. Similarly, in proposition of law seventeen, Lundgren asserts that the trial court committed jurors to a death penalty verdict when it inquired if the jurors could impose the death penalty "upon the Defendant." As Lundgren failed to object to the court's line of questioning at trial, we review these arguments under the plain-error standard. For the following reasons, we find no plain error exists.

{¶ 31} During voir dire, the judge asked each juror if he or she could "participate" in a death penalty verdict if the "evidence and law" required the recommendation of such a sentence. He also asked the jurors if they could "fairly consider the death penalty" if the "law and evidence" required deliberation on the subject. Finally, the judge asked if the jurors' views on capital punishment would "prevent or substantially impair" the performance of their duties as jurors. By asking these questions aimed at eliciting the jurors' potential biases, the court carried out its duty to ensure that jurors could fairly and impartially consider the death penalty in accordance with the law. See R.C. 2945.25(C) and *State v. Rogers* (1985), 17 Ohio St.3d 174, 177-178, 17 OBR 414, 417, 478 N.E.2d 984, 989. Contrary to Lundgren's argument, the trial court's questions did not repeatedly

imply that jurors had to impose the death penalty. In fact, the different phrasing of the questions shows that the court was attempting to determine if there was any level at which any of the jurors could not obey the law and the court's instructions concerning the death penalty. Thus, we find the court's questions did not predispose any juror toward the death penalty, and Lundgren has not proven that his substantial rights were affected. We also find the court's question about imposition of the death penalty "upon the Defendant" to be proper. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 424-425, 613 N.E.2d 212, 221. The question was permissible under *Rogers* and did not result in any type of juror commitment to the death penalty. *State v. Tyler* (1990), 50 Ohio St.3d 24, 32, 553 N.E.2d 576, 588.

{¶ 32} Additionally, in proposition of law four, Lundgren argues that the trial court made incorrect statements to the jury concerning the role of mitigating factors, allowed the prosecution to ask improper questions about mitigating factors, promoted juror confusion concerning mitigating factors, and failed to adequately investigate juror misconduct. Given our review of the record, we find Lundgren's claims concerning the trial court's handling of the mitigation topic without merit. We will discuss Lundgren's arguments concerning juror misconduct in our discussion of proposition of law five. Propositions of law four and seventeen are rejected.

{¶ 33} With proposition of law five, Lundgren alleges that several jurors' responses to voir dire questioning show that they were not fair and impartial. Lundgren first complains that the trial court should have excused jurors Crane and Bailey for cause because they were unwilling to consider mitigation. Specifically, he points to instances in which Crane could not, in the abstract, "think of any mitigating circumstances *** that would *** diminish the responsibility" for killing three young children and in which Bailey answered "No," when asked in the abstract if she would "consider any mitigating factors as reasons to justify a sentence of less than the death penalty for the killing of three children." However,

after reviewing the voir dire of these jurors in its entirety, we find that the trial court did not abuse its discretion in keeping Crane and Bailey. When first asked about mitigation, Crane replied that he had to "listen to everything before" making a "very serious decision like that." He assured counsel that he could return less than a death sentence and that the application of the death penalty "would have to depend on the circumstances of the case." Furthermore, Bailey explained that she did not understand the mitigation question when she responded negatively. Both Crane and Bailey fully agreed to consider mitigating factors as instructed by the court. Their inability to conjure abstract mitigating factors does not reflect an inability to be fair and impartial jurors.

{¶ 34} Next, Lundgren complains that jurors Rossman, Byers and King were unable to accord him the presumption of innocence. We also find this argument lacks merit. Juror Rossman agreed that he had some impressions that Lundgren "very well may be guilty"; however, he also said that he could set aside any opinions he may have associated with Lundgren and consider only evidence offered at trial. Rossman unequivocally responded that he understood the state's burden of proof and that he would recognize the accused's presumption of innocence. As to guilt, juror Byers admitted that he found "a little bit difficult" the concept that Lundgren did not have to present any evidence in his defense and that the state had the burden of proving Lundgren's guilt. However, in response to further questioning from the judge and a prosecutor, Byers unequivocally agreed that he could follow the court's instructions and Ohio law and not consider the fact that Lundgren did not offer any evidence if in fact that situation occurred. Finally, even though King also had the "impression" that Lundgren was guilty based on media reports, she agreed to try to disregard media reports and base her decision only on the evidence at trial. She also stated that she understood that Lundgren was presumed innocent and that the burden was on the state to prove him guilty. We note that Lundgren never challenged King for cause, possibly because King

disliked the death penalty, and thus waived any challenge to King's participation. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572.

{¶ 35} Additionally, Lundgren asserts that the jury misbehaved during jury selection. During voir dire, juror Bailey disclosed that she had heard comments about the case while sitting in the jury room. After this report, the trial court strongly reinstructed potential jurors "not to discuss this case among yourselves," but declined to reject all potential jurors in the group involved in the misconduct. The court allowed questions to future jurors about possible jury room discussions and particularly questioned seven potential jurors. Five of those seven denied any discussions; one said only that "idle chatter" and "gossip" had taken place. Another said all that occurred was that she told waiting jurors she was "very nervous." In this case, the trial court thoroughly questioned prospective jurors, satisfied itself that the jurors were fair and impartial, and did not abuse its discretion in declining to replace all jurors. See *State v. Webb* (1994), 70 Ohio St.3d 325, 338, 638 N.E.2d 1023, 1035; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 418, 575 N.E.2d 167, 174.

{¶ 36} Last, Lundgren complains that jurors Byers and King were members of the same church and knew each other. Nonetheless, both jurors asserted that their acquaintance would cause no difficulties, and each would make up his or her own mind. No basis existed to exclude either juror. We, therefore, overrule proposition of law five in its entirety.

{¶ 37} In proposition of law fourteen, Lundgren complains that an assistant prosecutor denigrated the reasonable-doubt standard when she commented during voir dire that the same standard applied in all criminal cases, including a "petty theft shoplifting case." However, the prosecutor's statement was literally correct, and the court's reasonable-doubt instructions negated any misconception by the jury. We note that Lundgren's failure to object at trial waived the issue and we find no plain error. *State v. Williams*, *supra*.

**{¶ 38}** Lundgren also complains that the prosecutor improperly vouched for the credibility of prosecution witnesses during voir dire by mentioning that the witnesses had entered into plea arrangements. Quite the contrary; the prosecutor simply tried to ensure that jurors would not be biased against his witnesses. By his comments, the prosecutor tried to "draw the sting" from the unfavorable fact that three state witnesses were accomplices and had plea-bargained to minimize their criminal exposure. See *State v. Tyler*, 50 Ohio St.3d at 34, 553 N.E.2d at 590. Such comments, based on evidence later before the jury, constituted harmless error at worst. See *United States v. Arroyo-Angulo* (C.A.2, 1978), 580 F.2d 1137, 1146-1147; *United States v. Isaacs* (C.A.7, 1974), 493 F.2d 1124, 1165. Again, we note that Lundgren did not object to the prosecutor's comments at trial and therefore waived all but plain error, which we do not find to exist. *State v. Williams*, *supra*. Proposition of law fourteen is without merit.

**{¶ 39}** Lundgren's propositions of law fifteen and sixteen both allege that the state misused its peremptory challenges. "[P]rosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control," apart from excluding jurors based on race, *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419, see, also, *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; or sex, *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89. Lundgren does not argue that either race or sex was the reason for these challenges.

**{¶ 40}** In proposition of law fifteen, Lundgren asserts the prosecutor challenged prospective juror Way because he belonged to a Mormon church between 1977 and 1979. However, the prosecutor never mentioned his reasons for challenging juror Way, which may have had nothing to do with Way's religion. Furthermore, Lundgren failed to object at trial and, therefore, waived this issue absent plain error. *State v. Seiber*, 56 Ohio St.3d at 13, 564 N.E.2d at 419. In proposition of law sixteen, Lundgren speculates that the prosecutor excluded

prospective jurors Griffiths, Pekol, and Walsh because of their reservations about the death penalty. Even if this is true, no impropriety resulted. *State v. Cook* (1992), 65 Ohio St.3d 516, 518, 605 N.E.2d 70, 76; *State v. Esparza* (1988), 39 Ohio St.3d 8, 13, 529 N.E.2d 192, 198.

**{¶ 41}** In propositions of law six through nine, Lundgren challenges the admission of several items of evidence. Although Lundgren correctly argues that the state overtried this case by presenting unnecessary evidence, Lundgren failed to preserve these issues at trial with objections. We, therefore, address these alleged errors under the plain-error standard to determine if Lundgren's substantial rights were affected. Crim.R. 52(B). Notice of plain error is taken only in exceptional circumstances to prevent a miscarriage of justice. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus; Crim.R. 52(B).

**{¶ 42}** We note that at the outset of the trial, Lundgren conceded that he had shot each member of the Avery family. Moreover, the evidence supporting his guilt was overwhelming. Although we find that the trial court erred in admitting some of the evidence Lundgren challenges, the effect of such evidence was harmless beyond a reasonable doubt, and its admission was certainly not plain error in view of the other overwhelming evidence of Lundgren's guilt. Additionally, any impact that this evidence may have had on Lundgren's sentence is minimized by this court's independent assessment of the sentence. See *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. As we find that none of the evidence Lundgren challenges materially prejudiced his essential rights or contributed in any way to the jury's findings of guilt, we reject all of these propositions of law.

**{¶ 43}** With proposition of law ten, Lundgren contends that the admission of gruesome photographs, testimony, and a videotape prejudiced his right to a fair trial and sentencing determination. Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Landrum*, 53 Ohio

St.3d at 121, 559 N.E.2d at 726; *State v. Maurer*, 15 Ohio St.3d at 264, 15 OBR at 401, 473 N.E.2d at 791. In capital cases, nonrepetitive photographs, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to an accused. *Maurer*, at paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.

{¶ 44} First, we address Lundgren's objections to the admission of sixteen autopsy photographs. We note that two of the photographs were repetitive and, therefore, admission of one of them was erroneous on that basis. Furthermore, after reviewing the balance of the contested photographs, we find that the probative value of the photos did not outweigh their prejudicial effect and, therefore, the trial court abused its discretion in admitting the photos. However, even where a court abuses its discretion in the admission of evidence, we must review whether the evidentiary ruling affected a substantial right of the defendant. Evid.R. 103 and Crim.R. 52(A). Due to Lundgren's concession that he shot the Averys and the other overwhelming evidence demonstrating his guilt, we find no basis for concluding that Lundgren's substantial rights were affected by the admission of this evidence. Moreover, any prejudicial impact the evidence may have had on the sentencing phase of Lundgren's trial is minimized by this court's independent assessment of the sentence. See *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. Thus, we find the trial court's error was harmless beyond a reasonable doubt.

{¶ 45} Similarly, Lundgren argues that the court should have rejected twenty-three color exhumation photographs, the testimony accompanying the exhumation photographs, and a color videotape of the exhumation process. We note that the photos and videotape show only an excavation, mud and debris. The bodies, though sometimes discernible, are not visible in detail and do not render this evidence gruesome. Still, we find that the probative value of this evidence did not outweigh its prejudicial effect and, therefore, the trial court abused its discretion in admitting the exhumation evidence. However, we also find that the admission

of this evidence did not affect Lundgren's substantial rights and was harmless beyond a reasonable doubt. Evid.R. 103 and Crim.R. 52(B). We reject proposition of law ten in its entirety.

{¶ 46} In proposition of law twenty, Lundgren asserts that the trial court erred in admitting into evidence items belonging to the Averys that were found amid the barn debris. Specifically, Lundgren objected to the admission of two diplomas, an engraved silver dish, a charm necklace, and a family photograph. He argues that this evidence constituted improper victim character evidence. These items were introduced to support the identity of the bodies buried in the barn. Lundgren's concession that he shot the Avery family did not render inadmissible this evidence of the identity of the victims. Although eyewitness testimony was also offered to identify the victims, we find that the admission of this relevant evidence did not prejudicially affect Lundgren's substantial rights. Thus, this proposition of law lacks merit.

{¶ 47} With proposition of law nineteen, Lundgren argues the trial court unfairly restricted the cross-examination of his accomplices concerning the full benefits of their plea arrangements. In fact, the trial court allowed cross-examination of Bluntschly, Olivarez, and Brand regarding their plea agreements, including questions about the offenses originally charged, the offenses to which each witness pled guilty, the conditions of the plea arrangements, and the maximum sentences to be recommended under the plea bargains. The trial court, however, did not allow counsel to mischaracterize the plea agreements or cross-examine the accomplices on speculative issues such as their possible probation or parole.

{¶ 48} "The scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge." *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493; Evid.R. 611(A). Here, we determine that no abuse of discretion occurred, since Lundgren had a full opportunity to demonstrate the bias or prejudice

of each of these accomplices. Moreover, we find that any possible error would be harmless beyond a reasonable doubt in view of the overwhelming evidence demonstrating Lundgren's guilt. Proposition of law nineteen, therefore, is not well taken.

{¶ 49} In proposition of law eleven, Lundgren argues that several instances of prosecutorial misconduct prejudiced his rights. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87. "[T]here can be no such thing as an error-free, perfect trial, and *** the Constitution does not guarantee such a trial." *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106.

{¶ 50} First, Lundgren argues that he was prejudiced by the prosecutor's introduction of the Avery family's putrefied clothing and comments concerning the smell of the clothing. While Evid.R. 403 would have prevented the prosecutor from introducing the Averys' clothing, Lundgren failed to object to the introduction of this evidence and the prosecutor's resulting comments. Thus, we must review this argument under the plain-error standard. We notice plain error pursuant to Crim.R. 52(B) under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636, 642. Nothing in the record suggests that, but for the prosecutor's misconduct, the jury's verdict would have been different. *Id.* We, therefore, find no plain error.

{¶ 51} Lundgren also complains about testimony elicited from witness Olivarez that Lundgren forced female cult members to dance naked before him while he masturbated. Although disgusting, this evidence showed Lundgren's power over the cult members. Again, Lundgren did not object to the testimony and we find no manifest miscarriage of justice. Moreover, that evidence would be

relevant as to Lundgren's history and character during the sentencing phase.  R.C. 2929.04(B).

**{¶ 52}** Additionally, Lundgren protests that the prosecutor compared him to Jim and Tammy Bakker and Dr. Jekyll and Mr. Hyde. We find that the remarks were inconsequential and note that Lundgren never objected to them. A prosecutor's comments can be "colorful or creative."  See *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538.  We also do not find error in the prosecutor's urging the jury to reach a "quick verdict" in view of the overwhelming evidence.

**{¶ 53}** Finally, Lundgren contends that the prosecutor violated his right to a fair trial by eliciting the following testimony from witness Brand:

"Q: Are you aware of anything in the scriptures, based upon your years in the RLDS Church, as to what should be done with a false prophet?

"***

"A:  Yes, sir.

"Q: Where would we find that in the scriptures if we wanted to look for it, Richard?

"A: Deuteronomy, Chapter 13.

"Q: And what does the scriptures command shall be done with a false prophet, Richard Brand?

"A: It says, you put them to death."

**{¶ 54}** Lundgren also complains that the prosecutor quoted the above-referenced passage from the Book of Deuteronomy during his guilt-phase closing argument and implied that this passage affected the correct interpretation of this case.

**{¶ 55}** As we summarily noted in proposition of law six, Lundgren failed to object to the prosecutor's questioning of Brand concerning the Book of Deuteronomy passage. Given the overwhelming evidence of Lundgren's guilt, we do not find that Brand's answer, which amounted only to a statement concerning

the content of the passage, affected Lundgren's substantial rights. We, therefore, also reject Lundgren's argument that the prosecutor's elicitation of this statement constituted prosecutorial misconduct. We, however, agree with the court of appeals that the prosecutor's quotation of this passage during his guilt phase closing argument was improper. Still, Lundgren failed to object to this portion of the prosecutor's argument, and we conclude that the argument was inconsequential to the jury's findings of guilt. Furthermore, any effect this argument may have had on Lundgren's sentencing can be cured by this court's independent reassessment of the sentence. See *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. In sum, proposition of law eleven lacks merit.

{¶ 56} With proposition of law eighteen, Lundgren argues that the state's evidence was insufficient to support the following death penalty specification: "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping ***, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." R.C. 2929.04(A)(7). Here, Lundgren makes the novel argument that even if he were guilty of kidnapping under a complicity theory because he directed and controlled the kidnapping of the Averys, that would not be sufficient to support a guilty verdict as to this death penalty specification. In other words, the offender must have personally committed the kidnapping.

{¶ 57} Under R.C. 2923.03(F), a person found "guilty of complicity in the commission of an offense *** shall be prosecuted and punished as if he were a principal offender." Nothing in R.C. 2929.04(A)(7) limits application of that specification only to the principal felony offender rather than one guilty of the same felony by reason of complicity. Moreover, Lundgren's theory leads to absurd results. Under his theory, cult members who participated as principals in the

kidnapping, but as accomplices in the murder, would be subject to the death penalty, while Lundgren, who not only conceived, organized, and directed the kidnappings, but also fired the shots killing the Averys, would not. Even if Lundgren's argument were correct, however, his death sentences would not be affected because of his unquestioned guilt as to the other death penalty specifications charged in the indictment. These specifications read, "the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." R.C. 2929.04(A)(5). Thus, we find proposition of law eighteen without merit.

{¶ 58} Lundgren's twenty-first proposition of law alleges that his convictions and sentences are void because his indictment did not conclude with the words "against the peace and dignity of the state of Ohio," as required by Section 20, Article IV, Ohio Constitution. However, that requirement is not "so essential as to nullify a conviction otherwise regularly obtained." *Ruch v. State* (1924), 111 Ohio St. 580, 586, 146 N.E. 67, 69. Even so, those words do appear at the end of the entire indictment.[1] This court held long ago that the "peace and dignity" language need not follow each count. *Olendorf v. State* (1901), 64 Ohio St. 118, 59 N.E. 892. We also note that Lundgren failed to object to the indictment before or at trial and, therefore, he waived this issue. See Crim.R.12(B)(2) and 33(E)(1); *State v. Mills* (1992), 62 Ohio St.3d 357, 363, 582 N.E.2d 972, 980. Thus, we reject proposition of law twenty-one.

II

Sentencing Phase

{¶ 59} The following facts are relevant to our discussion of Lundgren's propositions of law concerning the penalty phase of his trial. As a youth, Lundgren was mostly a loner, but was active in sports and church activities. His father, a strict

---

1. Although not used after the murder counts, those words are used after each kidnapping offense, which are the last counts in the indictment.

disciplinarian, enjoyed teasing and punishing him. Dr. Nancy Schmidtgoessling, a psychologist who testified for the defense, determined that Lundgren suffered from a mixed personality disorder with features of narcissism, paranoia, and antisocial traits. However, Lundgren's IQ of 124 was above average, and he was not schizophrenic or manic depressive. While growing up, Lundgren had little emotional support, and, as an adult, he developed intense feelings of grandiosity and a strong desire to control his environment. He could not maintain employment and "stole from almost" every one of his employers. Although Lundgren became obsessed with religion, at the time of the offenses, Lundgren did not have a mental disease or defect.

**{¶ 60}** In an unsworn statement lasting almost five hours, Lundgren explained his life-long search for spiritual truth and his visions. He quoted at length from the Old Testament and the Book of Mormon. Lundgren denied ever planning to take over the Kirtland Temple, but admitted killing the Averys. Lundgren asserted that he abhorred the sin he saw in the Avery family and explained that God commanded him to kill the Averys. He stated, "I cannot say that God was wrong. I cannot say that I am sorry I did what God commanded me to do in the physical act." Lundgren further explained, "I am a prophet of God. I am even more than a prophet. I am not a false prophet; therefore, I am not worthy of the [death] penalty." A rebuttal witness confirmed that Lundgren had planned an armed attack on the temple. Other evidence established that the RLDS had fired Lundgren as a temple guide because of theft allegations.

**{¶ 61}** In proposition of law twenty-four, Lundgren argues that the trial court unfairly denied his motion to allow the jury to view the Kirtland Temple prior to the sentencing phase. Under R.C. 2945.16, the court may order a view of any "place at which a material fact occurred." Nonetheless, granting a jury view "lies within the sound discretion of the trial court." *Calloway v. Maxwell* (1965), 2 Ohio St.2d 128, 31 O.O.2d 196, 206 N.E.2d 912; *State v. Zuern* (1987), 32 Ohio St.3d

56, 58, 512 N.E.2d 585, 588. In this case, neither the offense nor any "material fact" occurred at the temple. Also, the jury drove by the temple, and Lundgren used temple drawings to illustrate his unsworn statement. As we find no abuse of discretion, this proposition of law is rejected.

{¶ 62} With propositions of law twelve and thirteen, Lundgren alleges that he was prejudiced by inadmissible evidence and prosecutorial misconduct during the penalty phase of the trial. First, in proposition of law twelve, Lundgren argues that the prosecutor improperly presented rebuttal witnesses who testified unfavorably as to his character. Specifically, defense psychologist Schmidtgoessling testified that Lundgren "was let go from several jobs" because of conflicts and disagreements with others. She and others also stated that the church silenced and excommunicated Lundgren because his teachings were inconsistent with doctrine. The state presented the following rebuttal witnesses to dispute the impressions that might have been left by those statements. Bernard Wilson stated that he fired Lundgren at a Missouri hospital thirteen years earlier because Lundgren lied and could not be trusted. Lundgren was also involved in "misappropriation of some hospital equipment." A church official agreed that Lundgren and the church had doctrinal differences, but stated that the RLDS fired Lundgren as a temple guide mostly because of bookshop fund shortages, decreased contributions, and his solicitations from visitors. James Fincham, a coworker, confirmed that Lundgren had solicited contributions. Additionally, Lundgren flatly asserted in his unsworn statement, "I never had a plot to take over the temple." Sprague, a former cult member, testified as a rebuttal witness, describing Lundgren's military exercises and his plans to assault the temple and behead those living in the vicinity. Prosecutors may "rebut mitigation evidence offered by the defendant where the prosecutor has a good faith basis for believing that such evidence is false." *State v. DePew*, 38 Ohio St.3d at 285, 528 N.E.2d at 554. Given the total defense mitigation case, we do not find that the trial court abused its

discretion in allowing this rebuttal evidence. *Id.* at 285-286, 528 N.E.2d at 554. Proposition of law twelve lacks merit.

{¶ 63} In proposition of law thirteen, Lundgren asserts that several instances of prosecutorial misconduct denied him a fair sentencing determination. First, Lundgren claims that prejudicial error occurred because the prosecutor wrote a letter to Currie, an unindicted coconspirator, in which the prosecutor said he would review Currie's unindicted status if Currie cooperated with the defense. We agree that the conduct described in Lundgren's brief would be highly unethical. See *United States v. Matlock* (C.A.6, 1974), 491 F.2d 504; Annotation (1979), 90 A.L.R.3d 1231. Nonetheless, Currie testified as a defense witness without apparent reluctance or hesitation. We, therefore, find that Lundgren failed to show that he suffered any prejudice.

{¶ 64} Lundgren also complains that the prosecutor misstated the sentencing law and improperly defined mitigating factors as only those that "excuse" an offense. As Lundgren did not object to these issues at trial, he waived all but plain error. Here, we find that the prosecutor argued his case and did not attempt to describe governing law. Moreover, since the trial court gave correct sentencing instructions, any misstatements by the prosecutor could not have been outcome-determinative. Additionally, the prosecutor correctly observed that the jury need give little or no weight to evidence not found to be mitigating. *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598, at paragraph two of the syllabus. Thus, we find no plain error exists.

{¶ 65} We also do not find that the prosecutor improperly cross-examined cult members Johnson or Russell. With his mitigation evidence, Lundgren attempted to prove the sincerity of his religious beliefs. The prosecutor could question that sincerity by asking Johnson about Lundgren's plans to recruit additional followers and engage in more violence. Similarly, the prosecutor properly asked Russell to confirm that the RLDS faith never condoned lying,

stealing, adultery, or murder. As for the prosecutor's remark that Lundgren "defiled and blasphemed" Jesus Christ, we find that it constituted fair comment and did not improperly appeal to the jury's emotions. See *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 69.

{¶ 66} Finally, Lundgren contends that the prosecutor improperly commented on his unsworn statement. Specifically, the prosecutor remarked about Lundgren's knowledge of oaths. He reminded the jury of the following: "[Lundgren] made Kevin Currie swear an oath and if he violated that oath, he was to die. He had the naked dancing women swear an oath as they returned to their husbands *** and he had their humiliated husbands swear an oath of allegiance to him." We determine that these comments exceeded the proper limits as outlined in *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph two of the syllabus. However, we additionally determine that this error was harmless. *Id.* at 285, 528 N.E.2d at 554. Lundgren's statements had no mitigating value, and the aggravating circumstances in this case strongly outweighed any mitigating factors beyond a reasonable doubt. Moreover, this court's independent reassessment of the sentence can cure this error in the sentencing proceedings. See *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. We, therefore, reject proposition of law thirteen in its entirety.

{¶ 67} With proposition of law twenty-five, Lundgren argues for reversal of his sentence because of a juror's religious views. A newspaper quoted juror Dout as stating after the verdict that Lundgren "deserved" death. Specifically, Dout was quoted as saying, "Not only did he kill a family of five, but he put a black cloud over an entire religion." We find that Lundgren's argument lacks merit. Under Evid.R. 606, a juror is not a competent witness to impeach a verdict absent a showing of outside influence, which is not alleged here. Moreover, evidence of a juror's views as to why he reached a verdict, via newspaper hearsay, is doubly

inadmissible. Evid.R. 802. Finally, Dout's extraneous comment, even if true, does not impeach the verdict. Proposition of law twenty-five is overruled.

{¶ 68} In proposition of law twenty-six, Lundgren argues that the trial court's comments in its opinion and at the time of sentencing concerning Lundgren's lack of remorse reflect improper sentencing considerations. However, we do not find that the trial court converted Lundgren's lack of remorse into an aggravating circumstance by noting its absence. Lundgren's lack of remorse reflects upon his character. See R.C. 2929.04(B); *State v. Loza* (1994), 71 Ohio St.3d 61, 82, 641 N.E.2d 1082, 1104. Moreover, the trial court's decision accurately stated the statutory aggravating circumstances of which Lundgren was convicted. See *State v. Sowell* (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294, 1302. The trial court reasonably and accurately interpreted Lundgren's unsworn statement as an attempt to justify, not ask forgiveness for, the murders. By recognizing that fact, the court simply assigned that evidence the weight it thought appropriate. The weight to be given mitigation evidence is best left to the trial court. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Furthermore, this court's independent assessment pursuant to R.C. 2929.05 eliminates the effect of any error. See *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Landrum*, *supra*. Proposition of law twenty-six is rejected.

### III

### Jury Instructions

{¶ 69} In propositions of law twenty-two, twenty-three, and twenty-nine, Lundgren alleges deficiencies in the trial court's jury instructions during both the guilt and penalty phases of his trial. Again, Lundgren failed to object to most of the deficiencies he alleges and, thus, waived all but plain error as to those issues. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find that none of the alleged defects qualifies as

outcome-determinative and, therefore, no plain error occurred. *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Moreover, any instructional defects in the sentencing hearing can be cured by this court's independent reassessment of the sentence. See *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721. Finally, this court has previously rejected Lundgren's complaints in proposition of law twenty-nine concerning the statutory reasonable-doubt instruction. *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, death penalty vacated (1978), 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103. See, also, *Victor v. Nebraska* (1994), 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583.

**{¶ 70}** As argued in proposition of law twenty-three, Lundgren did object during the penalty phase to the trial court's statement that Lundgren's unsworn statement was not evidence. The court noted the following: "[Lundgren] made a statement, but did not testify under oath ***. It is his right under Ohio law to do so, and this statement ***, although not considered as evidence, may be considered by you for whatever purpose you may assign." These comments demonstrate that the court acknowledged the accused's right to make an unsworn statement, explicitly recognized the jury's right to consider the statement, and did not discourage the jury from doing so. These instructions were consistent with R.C. 2929.03(D), which provides for unsworn statements. See *State v. DePew*, 38 Ohio St.3d at 285, 528 N.E.2d at 554. Given that Lundgren's statement was nearly five hours long and both counsel referred to it in argument, we find that the members of the jury clearly understood, as instructed, that they could consider the statement in mitigation.

**{¶ 71}** Lundgren's last three propositions of law, thirty through thirty-two, challenge Ohio's death penalty statutes with arguments that this court has previously rejected. Thus, we summarily reject these propositions. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

IV

Ineffective Assistance of Counsel

{¶ 72} In proposition of law twenty-seven, Lundgren argues that his counsel's actions and omissions deprived him of his constitutional right to the effective assistance of counsel. Lundgren then refers to various other propositions of law in which he raised plain-error issues.

{¶ 73} Reversal of a conviction or sentence based upon ineffective assistance of counsel requires meeting the two-prong standard set out in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires (1) a showing of deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) a showing of prejudice, "errors *** so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

{¶ 74} However, "the Constitution *** does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac* (1982), 456 U.S. 107, 134, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783, 804. Lundgren's counsel need not have raised meritless issues, as previously discussed in propositions of law four, twelve, fifteen, sixteen, seventeen, twenty-six, twenty-eight, and twenty-nine.

{¶ 75} Furthermore, Lundgren's counsel vigorously and professionally defended his client in an unpopular cause. As a part of that strenuous defense, counsel could make tactical choices. Lundgren's trial strategy was to concede that he shot the Averys, but argue he did not deserve the death penalty, given his sincere religious motives. Under the facts, the decision not to object to issues raised in propositions of law five, six, seven, eight, nine, eleven, thirteen, fourteen, twenty-one, twenty-two, and twenty-three did not fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Also, Lundgren fails to demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject proposition of law twenty-seven.

V

Independent Sentence Assessment

**{¶ 76}** After independent assessment pursuant to our duties under R.C. 2929.05, we determine that the evidence supports the aggravating circumstances of which Lundgren was found guilty beyond a reasonable doubt. Now, we must also weigh the facts and evidence in the record and consider Lundgren and his offenses to determine whether the aggravating circumstances of which Lundgren was convicted outweigh the mitigating factors in this case beyond a reasonable doubt.

**{¶ 77}** First, we find that the nature and circumstances of these offenses do not offer the slightest mitigating value. In contrast, we determine that features of Lundgren's history, character, and background are entitled to some mitigating weight. Lundgren's difficulties in early childhood adversely shaped his personality, and his personality disorder, as attested to by Dr. Schmidtgoessling, adversely affected his ability to cope throughout life. He has four children and served honorably with the Navy during the Vietnam War. Additionally, we accord some mitigating weight to Lundgren's life-long struggles to find meaning and redemption through religion, the Bible, and the Book of Mormon. Unquestionably, he holds his religious beliefs deeply and strongly, and those beliefs helped shape his life. Overall, however, we find that the mitigating features of Lundgren's background, history, and character are entitled to only modest weight.

**{¶ 78}** As for the statutory mitigating factors specified in R.C. 2929.04(B), we find that Lundgren's lack of significant criminal convictions must be given some mitigating weight under R.C. 2929.04(B)(5). However, the other factors listed in R.C. 2929.04(B)(1) through (4), (6), and (7) do not appear to be applicable in this case. None of the victims "induced or facilitated" the offenses and Lundgren did not act under "duress, coercion, or strong provocation." Also, as Dr. Schmidtgoessling testified, Lundgren's personality disorder does not qualify as a

"mental disease or defect." See *State v. Seiber*, 56 Ohio St.3d at 8, 564 N.E.2d at 408. Finally, Lundgren, who was thirty-eight at the time of the offenses, was the principal offender. Except for Lundgren's personality disorder and the other matters already considered as to his history, character, and background, no "other factors" appear relevant. Therefore, weighing the aggravating circumstances against the foregoing mitigating factors, we conclude that the aggravating circumstances as to each murder for which Lundgren was convicted outweigh the mitigating factors presented by this case beyond a reasonable doubt.

{¶ 79} We also conclude that the death penalty imposed for each aggravated murder is appropriate and proportionate when compared with similar capital cases. This court has upheld the death penalty in cases involving "course of conduct" murders. See, *e.g.*, *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; and *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071, including the cases cited at 62 Ohio St.3d at 294, 581 N.E.2d at 1084. This court has also upheld the death penalty in cases involving murders occurring during the commission of a kidnapping. See, *e.g.*, *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; and *State v. Fox* (1994), 69 Ohio St.3d 183, 631 N.E.2d 124, including the cases cited at 69 Ohio St.3d at 195, 631 N.E.2d at 134.

{¶ 80} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., WRIGHT, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS and RESNICK, JJ., concur in part and dissent in part.

———————

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 81} While I concur in the judgment reached by the majority affirming appellant's convictions and sentence of death, I disagree with the majority's discussion surrounding the admission of photographic evidence in this case.

{¶ 82} In proposition of law ten, appellant asserts that the admission of, *inter alia*, autopsy and exhumation photographs prejudiced his right to a fair trial and sentencing determination. The majority concludes that the probative value of these photographs failed to outweigh their prejudicial effect, and thus their admission constituted error, albeit harmless error. I disagree that any error occurred.

{¶ 83} "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Given the broad discretion that is vested in a trial court to determine the admissibility of evidence, an appellate court should not disturb the decision of a trial court absent a showing that the trial court abused its discretion and that the defendant has been materially prejudiced thereby. *Id.* at 265, 15 OBR at 401, 473 N.E.2d at 791.

{¶ 84} The prosecution introduced sixteen autopsy photographs in the case *sub judice*. I find none of the photos to be repetitive, contrary to the majority's conclusion. Two photographs depict entire bodies, but a plastic sheet that covers the bodies negates their gruesome effect. In several others, mud and duct tape obscure the skin of the victims and mute any gruesome effect. Two pictures simply show a bullet hole in an area of the skin. Four photographs are definitely gruesome, showing bullet holes in portions of the skull, but they have substantial probative value, since they, like all of the other autopsy photos, portray the cause of death

and the killer's purpose to cause death. *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 550; *Maurer*, 15 Ohio St.3d at 265, 15 OBR at 401, 473 N.E.2d at 791.

{¶ 85} The prosecution also introduced twenty-three color exhumation photographs, along with a videotape of the exhumation. With respect to the photos, some show the pit into which the bodies were placed, while others depict various stages of the removal of each victim from the ground. Several photographs show the victims' bodies after removal and illustrate the way in which they were bound and gagged. While the pictures are certainly disturbing, their overall gruesome effect is limited by the dense mud which coats each victim's body. Furthermore, I believe the exhumation photographs carry significant probative value, since they convey an accurate picture of the manner in which the victims were bound and buried.

{¶ 86} Similarly, I believe the probative value of the videotape depicting the exhumation far outweighs any possible prejudicial impact. The tape shows only the excavation process, mud and debris. There are no discernible bodies to render the tape gruesome. *DePew*, 38 Ohio St.3d at 281, 528 N.E.2d at 550.

{¶ 87} For all of the foregoing reasons, I do not believe the trial court abused its discretion in admitting the autopsy photographs, the exhumation photographs or the exhumation videotape.

DOUGLAS, J., concurs in the foregoing opinion.

———————————

APPENDIX

**{¶ 88}** "Proposition of Law No. I[:] The trial court must grant a change of venue when pre-trial publicity is so pervasive that jury prejudice can be presumed. At the least, when pre-trial publicity creates the substantial possibility of juror prejudice, the trial court must allow voir dire questioning which is adequate to identify and eliminate biased jurors when there have been months of unrelenting, adverse, saturation pre-trial publicity.  The trial court's refusal either to grant a change or to allow voir dire adequate to root out biased jurors denies the capital defendant his Sixth, Eighth and Fourteenth Amendment rights to the trial by a fair and impartial jury and to exercise effectively his peremptory challenges.

**{¶ 89}** "Proposition of Law No. II[:] A motion for a new trial should be granted when the capital defendant demonstrates that his trial judge allowed a change of venue for a co-defendant under virtually the same circumstances in which the trial judge denied a change of venue in the defendant's case.

**{¶ 90}** "Proposition of Law No. III[:] When a small community has been saturated with months of sensational pre-trial publicity about the defendant's capital case, the trial judge must allow defense counsel to conduct a voir dire which is adequate to identify jurors who could not fairly consider mitigating evidence. Under such circumstances, the trial court's refusal to allow defense counsel to ask prospective jurors whether they could consider specific statutory mitigating factors relevant to the case violates the fair trial and sentencing guarantees in the Sixth, Eighth and Fourteenth Amendments and denies the defendant his Due Process Clause right to the effective exercise of his peremptory challenges.

**{¶ 91}** "Proposition of Law No. IV[:] When the trial judge conducts a death qualification process which creates a predisposition toward the death sentence, unfairly limits defense voir dire inquiry on mitigating factors and fails to adequately probe juror misconduct in voir dire the capital defendant is denied his fundamental

Sixth, Eighth and Fourteenth Amendment rights to trial on guilt and punishment by an impartial panel of jurors.

{¶ 92} "Proposition of Law No. V[:] The trial court failed to ensure [that] Mr. Lundgren was tried by a jury composed of fair and impartial jurors, thus violating Mr. Lundgren's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 93} "Proposition of Law No. VI[:] Opinion testimony at the guilt phase of a capital case on the ultimate punishment to be imposed is improper and irrelevant and violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 94} "Proposition of Law No. VII[:] Demonstrative testimony that is confusing and does not aid the trier of fact should not be admitted at a capital trial. To do so violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 95} "Proposition of Law No. VIII[:] Admission of irrelevant and highly inflammatory evidence about the defendant's extensive weapons collection, when that evidence relates only to a charge which was nollied [sic] before the capital trial even began, has such a prejudicial impact on both phases of trial that it denies the defendant his right to a fair trial on the issues of guilt and sentence as guaranteed by the Due Process Clause of the Fourteenth Amendment.

{¶ 96} "Proposition of Law No. IX[:] When the minimal probative value of gruesome and shocking evidence is substantially outweighed by the danger of unfair prejudice, such evidence should not be introduced or admitted. Admission of unfairly prejudicial evidence at the trial phase carries over to the penalty phase of a capital trial and denies the defendant his right, guaranteed by the Due Process Clause of the Fourteenth Amendment, to a fair trial and sentencing determination.

{¶ 97} "Proposition of Law No. X[:] The admission of inflammatory and gruesome photographs, videotape and testimony into a capital trial violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 98} "Proposition of Law No. XI[:] Pervasive prosecutorial misconduct that occurs in the guilt phase of a capital trial violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 99} "Proposition of Law No. XII[:] The prosecution may present penalty phase rebuttal evidence on the capital defendant's criminal history only in those instances where the defense has misrepresented the defendant's criminal history. *State v. DePew* (1988), 38 Ohio St. 3d 275, 528 N.E.2d 542, paragraph four of the syllabus, followed.

{¶ 100} "Proposition of Law No. XIII[:] Prosecutorial misstatements of law, misrepresentation of the weighing process, elicitation of inflammatory testimony, improper nullification of mitigating evidence, unwarranted comment on the defendant's unsworn statement and appeals for the death sentence on religious grounds operate, individually and cumulatively, to deny the capital defendant the fair and reliable sentencing determination guaranteed by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

{¶ 101} "Proposition of Law No. XIV[:] Prosecutorial misconduct occurred during the voir dire stage of the appellant's capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 102} "Proposition of Law No. XV[:] The discriminatory use of a prosecutorial peremptory challenge based merely on religious affiliation violates the First, Sixth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 2, 5 and 10 of the Ohio Constitution.

{¶ 103} "Proposition of Law No. XVI[:] The prosecutor's systematic use of peremptory challenges to exclude all prospective jurors with some reservations about the death penalty violated appellant Lundgren's right to equal protection and a fair and impartial jury in a capital case under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 10 and 16, Article I of the Ohio Constitution.

{¶ 104} "Proposition of Law No. XVII[:] To commit jurors to a death verdict during individual voir dire violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9 and 16, Article I of the Ohio Constitution.

{¶ 105} "Proposition of Law No. XVIII[:] Insufficient evidence existed to convict Mr. Lundgren of the R.C. 2929.04(A)(7) kidnapping specification attached to each count of aggravated murder. His subsequent conviction of this specification and its use to sentence him to death violated the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9 and 16, Article I of the Ohio Constitution.

{¶ 106} "Proposition of Law No. XIX[:] Under the right of confrontation guaranteed by the Sixth Amendment, defense counsel cannot be precluded from cross-examining accomplices on the full range of sentencing benefits they may receive in exchange for their testimony on behalf of the state.

{¶ 107} "Proposition of Law No. XX[:] The admission into evidence at the guilt phase of articles related to the victims, including personal belongings and a family photograph, violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 108} "Proposition of Law No. XXI[:] An indictment which fails to conclude with the language 'against the peace and dignity of the State of Ohio' is void and must be dismissed.

{¶ 109} "Proposition of Law No. XXII[:] It is unconstitutional to secure a capital conviction when all of the independent elements of the crime are not determined by a unanimous jury. Such a conviction violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 9, 10 and 16, Article I of the Ohio Constitution and R.C. 2901.05(D).

{¶ 110} "Proposition of Law No. XXIII[:] The trial court's instructions at both the guilt and penalty phases of appellant's trial were constitutionally infirm. The instructions violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 111} "Proposition of Law No. XXIV[:] Jury views are not limited just to the crime scene, but rather are appropriate at the places where material facts occurred. R.C. 2945.16. When material facts occur at a place which is integral to the penalty phase defense in a capital case, it is unfair and prejudicial for the trial court to deny the defendant's motion for a jury view.

{¶ 112} "Proposition of Law No. XXV[:] The Due Process Clause is violated when a juror sentencer impermissibly takes his own religious views into account in the sentencing process.

{¶ 113} "Proposition of Law No. XXVI[:] The trial court's comments at appellant's sentencing hearing and its opinion issued after the hearing contain irrelevant and improper considerations for sentencing Mr. Lundgren to death. Such considerations violated appellant Lundgren's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 114} "Proposition of Law No. XXVII[:] Defense counsel's actions and omissions at Mr. Lundgren's capital trial deprived him of the effective assistance of counsel as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the

United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 115} "Proposition of Law No. XXVIII[:] Venires drawn in a capital case which overrepresent certain age groups in the county violate the fair cross-section requirement of the Ohio and United States Constitutions.

{¶ 116} "Proposition of Law No. XXIX[:] The statutory definition of reasonable doubt in Ohio Revised Code, Section 2901.05 reflects a clear and convincing evidence standard which allows jurors to return a conviction and death sentence based on a degree of proof below that required by the Due Process Clause of the Fourteenth Amendment.

{¶ 117} "Proposition of Law No. XXX[:] Ohio's mandatory capital sentencing scheme prevented the jury from deciding whether death was the appropriate punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 118} "Proposition of Law No. XXXI[:] The Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution and Ohio Revised Code, Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio does not comport with this constitutional requirement and thus is fatally flawed.

{¶ 119} "Proposition of Law No. XXXII[:] The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 929.04 [sic] and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed

constitutional requirements and are unconstitutional, both on their face and as applied."

—————————————