OPINION
Defendant-appellant, Vincent Doan, appeals his conviction, rendered in the Clinton County Court of Common Pleas, of one count of aggravated murder and three counts of kidnapping. We affirm appellant's conviction.
The events leading to appellant's convictions occurred on August 28 and 29, 1996. In the summer of 1996, Clarissa Ann Culberson aka Carrie Culberson was playing in a coed volleyball league in Morrow, Ohio. The league played every Wednesday night including Wednesday, August 28, 1996. Jessica Williams and Tonya Whitten, friends of Culberson and members of the volleyball team, picked Culberson up at her house at 6:30 p.m. Culberson had at most five dollars that evening. They arrived at the bar where they were to play volleyball at approximately 7:30 p.m. Appellant, Culberson's boyfriend, then arrived in his black Mustang. Appellant and Culberson had a conversation in which Culberson kept shaking her head "no." Culberson told appellant that he could not go home with her because she needed to drive Whitten and Williams home because they were intoxicated. Culberson had planned to say this to avoid driving home with appellant. In response to Culberson's statement that she needed to drive, appellant told Williams "[y]ou don't need her to take you home, do you."
At approximately 11:15 p.m. on August 28, 1996, Williams, who was in her vehicle with Culberson, drove by appellant's house. Appellant's vehicle was there. Williams, at Culberson's request, drove by appellant's house a second time. At approximately 11:30 p.m., Culberson was dropped off at her home. A few minutes later, Kim Lannerd, a neighbor of the Culbersons, witnessed Culberson leaving in her red Honda CRX.
On August 29, 1996, at approximately 12:30 a.m. to 12:45 a.m., appellant was seen chasing Culberson in the front yard of Billie Jo Brown. Brown lived across the street from the Doan home. Her address was in the village of Blanchester, Clinton County, Ohio. Brown had seen appellant across the street that summer, but did not know him by name. Brown recalled seeing Culberson visit appellant "a couple times a week" and that Culberson drove a "little red car." At trial, Brown identified the red Honda CRX that Culberson had been driving.
Brown heard voices in the yard and looked out her bedroom window. Unable to see what was occurring, Brown then looked out her living room window. She could see Culberson's vehicle with the driver's door open. Brown next looked out the kitchen window and witnessed "[a] young woman and a gentleman in my yard and they had loud voices and she's running from him." Brown testified that Culberson was asking for help. At this time, Brown did not know Culberson's name, but at trial, she identified Culberson from a picture. Brown witnessed Culberson trip in Brown's front yard and appellant catch her, grab her by the arm, swing her around and punch her in the face. Brown testified that the man chasing Culberson stated "I told you the next time I'd kill you, you fucking bitch."
Brown witnessed Culberson struggling and screaming for help. She managed to get away temporarily and ran behind a car in Brown's driveway. Brown went to wake her husband. She heard squealing tires. The consistent evidence at trial was that appellant routinely "peeled out" when driving his black Mustang and would squeal his tires. When Brown returned, Culberson's vehicle, appellant and Culberson were gone. Appellant's black Mustang was parked in front of his house. Brown identified appellant as the man chasing Culberson in her yard.
Jeff Warren, a friend of appellant, lived in Marathon, Clermont County, Ohio. Warren testified that on August 29, 1996, at approximately 1:00 a.m., appellant was tapping at his bedroom window. Appellant told Warren he wanted to use the phone and Warren agreed. Appellant stated he "was out of gas." Appellant never asked Warren for gasoline or any help, except for the use of his phone.
Appellant next appeared at the home of his half-brother, Tracey Baker. Tracey Baker lived on Supinger Street in the village of Blanchester, Clinton County, Ohio. At the Baker home that evening were Tracey Baker; Lori Baker, who had divorced Tracey Baker, but was living with him; Vicki Watkins, Lori's twin sister; the Bakers' son and daughter; and Watkins' four children. Watkins was staying at the Baker home that evening. Watkins testified she "wasn't supposed to be there" because Tracey Baker did not allow Watkins to stay overnight. Watkins went to sleep at approximately 10:30 p.m. to 11:00 p.m. and planned to leave early for work the next morning.
Watkins was awakened at 3:15 a.m. when she heard a knock on the back door adjacent to the window in the bedroom in which she was sleeping. A light was "on the side of the [back] door." Watkins could see appellant outside. Watkins identified appellant's "grim reaper" tattoo located on his shoulder. Watkins could see appellant was wearing "light colored jeans," but no shirt. Appellant "looked dirty," "grungy looking" with "messed up" hair.
Appellant knocked again and Lori Baker answered the door. Appellant asked if Tracey Baker, his half-brother, was home and Lori Baker replied that he was home. Appellant entered the Baker home and shut the door. Soon after, Watkins heard appellant and Tracey Baker talking on the deck and appellant "giggle." About one-half hour later, at approximately 3:45 a.m., appellant and Tracey Baker left in Tracey Baker's truck.
Lori Baker recounted the same events as Watkins from her personal observations. When Lori Baker opened the back door for appellant, she testified that appellant was wearing only jeans and had blood on his chest, arm and [jeans]." Lori Baker described the blood as "smeared" and "covered on." Appellant had his head down and looked "distraught" and "real strange looking." Appellant asked for Tracey Baker. Lori Baker motioned to the bedroom.
Appellant entered the Bakers' bedroom. Lori Baker heard the shower running. Tracey Baker asked Lori Baker for garbage bags. The shower stopped running and appellant appeared looking "a lot better" and fully clothed. Appellant and Tracey Baker left with seven garbage bags and a gun.
Tracey Baker and appellant returned to the Baker home at approximately 6:00 a.m. Earlier in the morning, Lori Baker had taken Watkins to work and went back to bed. When Tracey Baker and appellant returned, Lori Baker got out of bed. Lori Baker gave Tracey Baker bleach and a scrub brush for appellant to use. Lori Baker washed Tracey Baker's clothes, but observed blood on them before washing them. Lori also observed Tracey wipe what appeared to be blood off his boots. An analysis of the boots later showed blood on them. Appellant took another shower. Appellant and Tracey sat on the couch for approximately ten to fifteen minutes looking "pale" and "real quiet."
Appellant left for work at approximately 6:20 a.m. Tracey Baker told Lori Baker that "the police would be coming," but not for the marijuana plants that Tracey Baker was growing at the Baker home. Nevertheless, Tracey Baker told Lori Baker to get rid of the marijuana plants.
At approximately 4:00 p.m., at the Baker home, appellant asked Lori Baker if he could borrow her car. The car had a full tank of gas and was messy. At approximately 6:00 p.m., Lori Baker went by Priscilla Doan's house [appellant's mother] to exchange vehicles with appellant. Lori Baker could see appellant's vehicle. A sheet was on the back seat and the seat was "damp." Lori Baker could see "a smear of something and a hunk of something" adjacent to the door. Appellant did not return Lori Baker's vehicle until the next morning. Appellant told Lori Baker he had been looking for Culberson and had "passed out" from drinking. Lori Baker's vehicle had been cleaned, but smelled from alcohol. The gas tank was empty. A few days later, on the Baker's deck, appellant was upset, pulled his shirt over his head and stated that "I can't imagine holding someone and — hurting someone and holding her till she died."
After appellant's arrest, he was incarcerated with Mitchell Epperson. Epperson and appellant were discussing "girls cheating on us." Appellant stated that "when they do that you can't let them get away with it, you can't let them walk on you, you got to make them pay." Appellant also told Epperson that "he would lay awake at night and think of a hundred different ways to kill her before he did it."
On Thursday, August 29, 1996, Tonya Whitten spoke to appellant about where Culberson "might have gone." Appellant told Tonya Whitten to ask "the little boys" Culberson "ran around with." Robert Shelton II testified that, at approximately 3:00 p.m. on August 29, 1996, appellant told him that he wanted car ramps to "cover something up."
Ben Lunsford, Jr., a Patrol Deputy with the Clermont County Sheriff's Department, went to the Baker property on about September 3, 1996 to assist the Blanchester Police Department in a search. Lunsford noticed a small pond on the property. Lunsford went back on September 4, 1996 with a search warrant. It was a hot, sunny day. Lunsford got dried dirt on his pants from the area adjacent to the pond. The day before, Lunsford had no dirt on his pants. The inference is that someone had been in the pond between Lunsford's two visits and the dirt adjacent to the pond had been disturbed. Brian Edwards of the Clinton County Sheriff's Office testified that the pond was drained the afternoon of September 4, 1996. Edwards observed "what appeared to be footprints that led into the pond from a path and then another set that was leading out of the pond."
The evidence at trial showed appellant had a violent and controlling relationship with Culberson up to the night of the kidnapping and murder. Brian and Tonya Whitten own a fitness and tanning business in Blanchester. On Tuesday, August 27, 1996, Culberson was tanning when appellant arrived. Appellant was "edgy" and "aggravated." Appellant told Brian Whitten that he and Culberson had spent a day at the lake that weekend. Appellant told Brian Whitten that "I don't know why that fucking bitch was in there tanning. We spent all day at the lake and I'm red."
On the morning of Thursday, August 29, 1996, appellant called the Whittens' fitness and tanning business. Brian Whitten testified that appellant called often. Appellant would call, and if Culberson was not there, he would call again or stop by. This pattern was repeated numerous times. However, when Culberson was not there that day, appellant never called back or visited the Whittens' business ever again.
On Tuesday, August 27, 1996, Culberson told Tonya Whitten that on the prior Sunday appellant and Culberson had gone to lunch. On the way back, appellant pulled over and removed a gun from the trunk. Whitten testified that appellant held Culberson at gunpoint for four and one-half to five hours. Appellant told Culberson that "you think I'm a big joke, and I'll show you how big a joke I am, I'm not going to go to jail * * *." The reference to jail was a pending charge in the Clinton County Municipal Court against appellant for an incident (detailed later) in which appellant hit Culberson over the head with a space heater. Later, on the phone, Whitten stated appellant told Culberson "he was going to kill her and her family."
Culberson told Tonya Whitten about an incident between her and appellant in July 1996. Culberson went to appellant's home to tell him she was going to "something like" a Tupperware party. Appellant told Culberson she was not going and began "throwing things in his room." Appellant then hit Culberson in the head with a space heater. Culberson was bleeding badly. Appellant then followed Culberson home. In Culberson's presence, appellant called Culberson's mother "a fat bitch."
Cicely Kukuk, Culberson's best friend, testified at the trial. In the winter of 1995, Culberson was living with Kukuk. Culberson received a phone call from another "gentleman caller" when appellant was present. Appellant apparently picked up the phone in the kitchen while Culberson was in the bedroom. After the conversation, appellant called Culberson a "fucking bitch." Appellant pulled Culberson's hair, punched her in the eye and "drug her through the bedroom." Appellant said he was going to look for the person who called. Appellant told Kukuk if she called the police she "would be sorry."
In March 1995, outside of a bar, appellant punched Culberson in the side of her body. In the spring of 1995, appellant "smashed [Culberson's] face into [a] steering wheel." Appellant told Culberson that "[Culberson and Kukuk] were laughing at him and he didn't appreciate it." In the summer of 1996, appellant scratched Culberson's face and bruised her neck by putting his hands on her neck and over her mouth and nose.
Georgia Falgner testified about an incident between appellant and Culberson on or about January 15, 1996. Falgner was driving home for work and witnessed appellant kicking a vehicle. Falgner noticed Culberson in the vehicle and that appellant had broken the driver's side window. Appellant was holding Culberson by her hair. Falgner asked Culberson if she needed help and Culberson told her to call the police. Appellant screamed at Falgner to "get the fuck out of here or you're next."
Desiree Gruber owns a salon in Wilmington. Culberson worked there from September 1995 until her last day of work on August 22, 1996. Culberson was taking time off to study for an upcoming nursing exam. After approximately two weeks, Culberson came into work with a black eye, which Culberson told Gruber was caused by appellant. In April 1996, Culberson came to work with "her face grotesquely swollen, her eyes were both swollen, but one was swollen almost shut, her lips were split, her nose was swollen, her whole face was various colors of black and blue." Culberson also had bruises on her back. Culberson told Gruber appellant caused all these injuries.
In May 1996, outside the salon, appellant "grabbed Carrie by her upper arms and he picked her up and slammed her against the trunk, and then he let go and he stepped back." Gruber noted that "[Culberson's] feet left the ground." On or about August 17, 1996, after the previously described space heater incident, Gruber offered to hide Culberson somewhere out of town and offered her money to help her leave. Culberson declined because she believed appellant would hurt her family.
Gruber also testified that appellant called Culberson at least twice daily at the salon when she worked. Appellant called the salon before Culberson arrived for every shift, but never more than twenty-five minutes before her scheduled shift. On Thursday, August 29, 1996, Culberson was scheduled to work from 2:00 until 6:00 p.m. Appellant broke this pattern by calling at 11:30 a.m. and 12:00 p.m. Gruber was "stunned." Appellant never called the salon again.
Julie Long testified that appellant tried to suffocate Culberson on Thanksgiving in 1995. In approximately April 1996, appellant and Culberson got in a fight. Appellant "beat [Culberson's] head against the road [and] against telephone poles."
In appellant's defense, a series of witnesses were presented who purported to see Culberson after the murder was to have occurred. Appellant argued at trial that Culberson may have left town. Gabrielle Jones testified she saw Culberson on August 29, 1996 between 11 and 11:30 a.m. in her vehicle with the car packed full of clothing. Helen Hedrick, her sister, Nancy Jane Cecil, and Patricia Lille testified they picked up a hitchhiker on August 31, 1996. They dropped her off at the Green Valley convenience store. They later believed it was Culberson after seeing her picture on a television news program. Catherine Hackney testified she conversed with appellant outside the store where she worked, "68 First Stop" in Williamsburg. Tina Haight claimed to see someone she believed was Culberson at a gas station. Haight testified she had taken a correspondence class in "private investigations." Mary Louise Danbury testified that on September 5, 1996, while driving in Williamsburg, she saw a woman driving a red Honda CRX with four digits of the license plate being "R-O-L-4," but could not identify Culberson. Danbury testified she had "low vision" in her left eye.
Tammie Brummett testified that she saw Culberson on September 6, 1996 on Mad River Road between Owensville and Hillsboro walking with a suitcase. Brummett testified Culberson had no marks on her face. Charles Sharp testified that on September or October 10, 1996, he saw Culberson's license plate "ROL-402" on a rear plate. He spent four hours searching Blanchester for the vehicle without success. He testified that the female in the car had a "similar" face to Culberson, but different hair. Amy Rene Brewer testified that she might have seen Culberson in a vehicle on April 20, 1997. Patty K. Brewer, whose husband is a distant relative of the Bakers, thought she saw someone who looked like the picture of Culberson at her place of work.
Phyllis Lunsford, who owns a tire shop, testified that on May 16, 1997 a man drove to the shop with a red Honda CRX with Culberson's license plate number on the front plate. The man had a tire repaired and paid in cash. He did not take a receipt. She had heard the license plate number that morning on television.
Kenneth Lancaster of the Norwood Police Department testified that on May 16, 1997 at approximately 4:00 a.m., he witnessed a vehicle approaching him "from the opposite direction at a quick rate of speed." He ran license plate "R-O-L-4-0-2." Lancaster read the number off the front license plate. The evidence later showed Culberson never put the front license plate on her vehicle. The front license plate was recovered, in pristine condition, from the Culberson home. Lancaster testified at trial that his identification must have been mistaken.
Appellant also presented an alibi. Betty Baker, appellant's stepmother, testified that appellant called the Baker home at 1:00 a.m. on August 29, 1996. Betty Baker testified that at some point between 1:30 to 2:00 a.m., appellant was sleeping on the couch. Lawrence Baker, appellant's father, testified that appellant called from Jeff Warren's home at about 1:00 a.m. on August 29, 1996. Lawrence Baker testified that he saw appellant sleeping at approximately 1:30 a.m. to 2:00 a.m.
Culberson's body was never recovered. After August 28, 1996, all activity on Culberson's bank account, which was overdrawn, ceased. There was no credible evidence presented that Culberson planned to leave her home in Blanchester.
On June 4, 1997, appellant was indicted on two counts of aggravated murder[1] with death penalty specifications[2]
as well as four counts of kidnapping.[3] After a trial by jury, appellant was found guilty of three counts of kidnapping, R.C. 2905.01(A)(3) and R.C. 2905(B)(1) and (2), and one count of aggravated murder, R.C. 2903.01(B), with one death penalty specification, R.C. 2929.04(A)(7). Appellant was found not guilty of one count of kidnapping, R.C. 2905.01(A)(5), and one count of aggravated murder, R.C. 2903.01(A). In the penalty phase for the aggravated murder with death penalty specification conviction, the jury recommended life without possibility of parole. The trial court sentenced appellant to life without possibility of parole consecutive to a nine-year prison term for the kidnapping counts. Appellant filed a timely notice of appeal and presents this court with eleven assignments of error for our review.
Assignment of Error No. 1:
 DOAN WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT GAVE THE JURY AN IMPROPER, MISLEADING, AND CONFUSING INSTRUCTION WHICH LESSENED THE STATE'S BURDEN OF PROOF FOR A CONVICTION.
In his first assignment of error, appellant argues that the trial court deprived appellant of due process of law by giving the jury an improper civil jury instruction. Before deliberations, the parties' counsel and the trial judge reviewed the state of Ohio's submitted jury instructions. In order to supplement the definition of circumstantial evidence in the jury instructions, counsel for appellant suggested a "cautionary instruction" about jurors drawing an inference upon an inference. The court agreed to the jury instruction. The following jury instruction was included and read to the jury:
 You may infer a fact or facts or reach a reasonable conclusion about a fact of facts only from other facts or circumstances that have been proved by the greater weight of the evidence, but you may not infer a fact or facts, or make inferences * * * you may infer a fact or facts or reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by the greater weight of the evidence, but you may not infer a fact or facts, or make inferences or reach a conclusion about a fact or facts from a speculative or remote basis that has not been established by a greater weight of the evidence.
This jury instruction was from Ohio Jury Instructions 5.10 and is a civil jury instruction. The instruction improperly included the "greater weight of the evidence" burden of proof and was given in error. See, generally, In re Winship (1970), 397 U.S. 358,90 S.Ct. 1068 (in order to find a defendant guilty of a crime, every element of the crime must be proven beyond a reasonable doubt). During the third day of deliberation, the jury requested this particular instruction read back to them. The erroneous instruction was again read to the jury. Appellant's counsel, realizing the mistake, then objected to the instruction.
In determining whether the erroneous jury instructions was prejudicial, we look to the jury instructions as a whole. Statev. Van Gundy (1992), 64 Ohio St.3d 230, 233; State v. Getsy
(1998), 84 Ohio St.3d 180, 196. The question is did the instructions, as a whole, correctly convey the concept of reasonable doubt to the jury. Van Gundy at 233-34. If they did, the erroneous instruction can be considered harmless error.
We have reviewed the instructions given to the jury in their entirety. At the beginning of the jury instructions, the jury was told that "[t]he defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense as charged in the indictment." In the next two paragraphs, "reasonable doubt" is properly defined for the jury and was not amplified in an unconstitutional manner. See R.C. 2901.05(D) (Ohio's statutory definition for "reasonable doubt"). The erroneous "greater weight of the evidence" jury instruction follows. Later in the instructions, the venue instruction gives the beyond a reasonable doubt standard of proof. In completing the reading of the jury instructions, the trial court read the elements of the counts against appellant. The standard of proof, "beyond a reasonable doubt," was read an additional twenty-seven times.
Although the "greater weight of the evidence" jury instruction was in error, the correct standard of proof, beyond a reasonable doubt, was properly defined for the jury and that standard was repeated throughout the jury instructions. The beyond a reasonable doubt standard of proof was emphasized by both parties' counsel and the trial court during voir dire. We find the error did not prejudice the jury deliberations and, therefore, appellant's constitutional right to a fair trial. The first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DOAN BY ADMITTING INTO EVIDENCE, OVER OBJECTION, HEARSAY TESTIMONY THAT DOAN HAD PHYSICALLY ABUSED OR THREATENED CARRIE CULBERSON.
In his second assignment of error, appellant argues he was prejudiced by the admission of various hearsay statements. The trial court found these statements, detailed in our discussion below, were admissible under an exception to the hearsay rule.
The trial court has broad discretion in determining whether relevant evidence can be admitted. State v. Goodson (May 10, 1999), Preble App. Nos. CA98-07-008, CA98-08-013, unreported, at 9, citing State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of syllabus. Absent an abuse of discretion and a showing of material prejudice, a trial court's ruling on the admissibility of evidence will be upheld. Id., citing State v. Martin (1985),19 Ohio St.3d 122, 129.
Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible in evidence unless the evidence meets one of the recognized exceptions to the hearsay rule. Evid.R. 802. Evid.R. 803(2) allows the admission of hearsay under the "excited utterance" exception, which is defined as:
 A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
An excited utterance is one in which the declarant was under the excitement of a startling event and, therefore, the statement was not the product of reflection. State v. Taylor (1993), 66 Ohio St.3d 295,300. The Supreme Court of Ohio has stated that:
 There is no per se amount of time [between the occurrence and the statement] after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought. (Emphasis sic).
 Therefore the passage of time between the statement and the event is relevant but not dispositive of the question.
Id. at 303.
Tonya Whitten testified to what Culberson told her about being held by appellant, who had a gun, for three and one-half to four hours in August 1996. Culberson told Whitten about this event on Tuesday morning, August 29, 1996. The event happened either the prior evening or Sunday evening. We find, considering the harrowing nature of the event, the trial court was within its discretion to admit this evidence as an excited utterance. We find the testimony of Shannon Culberson about the same event similarly admissible. Of course, the testimony of appellant's statements to Culberson are admissible as admissions of a party-opponent.
Kukuk, Culberson's best friend, testified Culberson told her, the day after the incident, about the scratches to her face and neck inflicted while appellant tried to suffocate her. Considering our deferential standard of review, we also find this statement admissible as an excited utterance. The testimony by Julie Long about the suffocation incident did not include a time frame between the statement by Culberson and the incident. Thus, it should not have been admitted as an excited utterance. However, the testimony added nothing to Kukuk's testimony and was not materially prejudicial. Gruber also testified about the suffocation incident. Such testimony was also improperly admitted, but this testimony also added substantially nothing to Kukuk's testimony.
Gruber testified about Culberson's appearance in April 1996, including Culberson's grotesquely swollen face, swollen eyes and nose, split lips and black and blue face. This description is not hearsay because it is not a statement. It was simply Gruber's personal observation. Gruber stated that Culberson told her, one or two days after the incident, that Doan had hit Culberson and thrown her to the ground causing these injuries. Based upon our standard of review, we find this statement admissible as an excited utterance. Even if not admissible, we do not find the statement materially prejudiced appellant's right to a fair trial. Culberson's statement to Gruber that her black eye was caused by appellant was not admissible as an excited utterance because the time frame between the statement and the incident was never established. However, Gruber personally witnessed the black eye and her description of the black eye was admissible. In light of the overall admissible evidence of appellant's violent behavior toward Culberson, we find the admission of Culberson's statement to Gruber concerning the black eye did not materially prejudice appellant's right to a fair trial.
Gruber testified that Culberson related to her that she could not leave town because Doan would hurt Culberson's family. This statement attacked the defense's theory that Culberson may have left town and was still alive. Thus, the statement was not admitted for the truth of the matter and is not hearsay. Instead, the statement shows why, based upon Culberson's impression of the situation, Culberson would not have left Blanchester. Similar testimony by Long is admissible for the same reason.
The testimony by Long about appellant hitting Culberson against the pavement and telephone poles did not have a time frame. Therefore, without that foundation, it should not have been admitted as an excited utterance. However, in light of the overall evidence in this case, particularly the myriad of other admissible demonstrations of appellant's violent behavior toward Culberson, as well as admissible statements of appellant threatening Culberson, this error did not materially prejudice appellant right to a fair trial.
An affidavit, state exhibit 35, was written by Culberson several hours after the space heater incident. We find the trial court was within its discretion to admit the affidavit as an excited utterance. In any event, we also find much of the affidavit duplicative to other testimony. Culberson told appellant, in Debbie Culberson's presence, almost immediately after the incident that appellant was only concerned about getting in trouble and was making up a story. Those statements are admissible as excited utterances. That testimony, combined with Debbie Culberson's personal witnessing of Culberson's injuries, conveys the gist of the event, i.e., appellant caused Culberson, by his violence, to bleed from her head. In addition, appellant's ludicrous explanation of her injury, admissible as a statement of a party-opponent, that Culberson "had fallen on a pole" is more evidence of appellant protecting himself. Finally, appellant admitted to Debbie Culberson that he slapped Culberson, but denied punching her. This statement is also admissible as a statement of a party-opponent.
We also note that, with regard to the hearsay we found improperly admitted, the most incriminating evidence in this case concerns the night of the crime. For example, the testimony of Lori Baker and Watkins, which the jury chose to believe, was devastating proof of appellant's guilt. With regard to the kidnapping counts, the same can be said of Brown's testimony. Appellant's near-confessions on the deck of the Baker home and to Epperson were similarly devastating proof of guilt.
Appellant also argues that due to the erroneous admission of hearsay, he was denied the right to cross-examine witnesses against him as guaranteed by the Confrontation Clause of theSixth Amendment to the United States Constitution.[4] However, inWhite v. Illinois (1992), 502 U.S. 346, 357, 112 S.Ct. 736, 743, the United States Supreme Court held that evidence admitted under a "firmly rooted" hearsay exception is sufficient for Confrontation Clause purposes.[5] As we have already concluded the admission of all the out-of-court statements raised in appellant's brief were within the trial court's discretion and/or did not materially prejudice appellant receiving a fair trial, the mandates of the confrontation clauses of the Ohio and United States Constitutions have been satisfied. The second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DOAN'S CONSTITUTIONAL RIGHTS TO DUE PROCESS IN ADMITTING, OVER HIS OBJECTION, EVIDENCE OF ALLEGED PRIOR ACTS INVOLVING PHYSICAL ABUSE OF CARRIE CULBERSON.
In the third assignment of error, appellant argues his constitutional right to due process of law was violated by the admission of prior bad acts by appellant. These acts, like the previously discussed hearsay statements, concerned abuse inflicted on Culberson by appellant prior to the kidnapping and murder. Evid.R. 404(B) states that:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
See, also, R.C. 2945.59. The import of Evid.R. 404(B), in the criminal context, is that evidence which shows a defendant committed prior acts is inadmissible to show "he acted in conformity therewith" by committing the charged crime. Stated in simpler terms, evidence cannot be admitted merely to show a defendant has a criminal or violent character. State v. Martin
(1985), 19 Ohio St.3d 122, 128. However, under the exceptions to Evid.R. 404(B), evidence can be admitted to show, inter alia, motive or intent.
We have detailed the evidence of past abuse above and will not repeat it here. We have reviewed each and every statement of past abuse admitted at trial which appellant questions in his brief. All of these statements show appellant's need to physically and psychologically control Culberson and their relationship. Cf. State v. Battle (Aug. 11, 1993), Summit App. No. 15869, unreported (prior acts properly admitted to show defendant's motive for rape was a need to control the victim). In some cases, appellant directly threatened Culberson's life. The evidence showed, not only through his threats and physical abuse, but by his obsessive calling of her place of work and the Whittens' business, as well as his statements to Epperson once arrested, that appellant wished to control Culberson.
The evidence admitted pursuant to Evid.R. 404(B) showed appellant's motive for kidnapping and murdering Culberson was control. We recognize some of these statements and/or acts occurred up to eighteen months prior to the murder. However, all the testimony concerning prior acts is part of the continual pattern of physical and psychological abuse which shows appellant would resort to violence in order to control Culberson. We find all of the statements concerning prior acts were admitted within the discretion of the trial court to show appellant's motive for kidnapping and murdering Culberson. In addition, some of appellant's prior actions, most notably the prior act of holding Culberson at gunpoint for three and one-half to four hours, shows his intent to kidnap and murder Culberson on the night of the crimes. The third assignment of error is overruled.
Assignment of Error No. 4:
 DOAN WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT REFUSED TO ALLOW DEFENSE COUNSEL ACCESS TO INCONSISTENT WITNESS STATEMENTS PURSUANT TO CRIM.R. 16(b)(1)(g).
Crim.R. 16(B)(1)(g) provides, in relevant part, that:
 Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of such inconsistencies, if any, between the testimony of such witnesses and the prior statement.
In interpreting this paragraph of Crim.R. 16(B)(1)(g), the Supreme Court of Ohio has held that, upon a timely motion by the defendant, attorneys for all parties must be given the opportunity to review out-of-court witness statements for "any perceived inconsistencies between the testimony of the witness and the prior statement." State v. Daniels (1982), 1 Ohio St.3d 69, syllabus. However, appellant's trial counsel elected to have the trial court review any potentially inconsistent statements. State v. Doan
(Apr. 15, 1999), Clinton CA97-12-014, unreported (Entry Granting Request for Reconsideration). Therefore, the trial court's action were not in error because, unlike Daniels, a timely motion to personally review the statements was never made. Appellant argues for reversal based on plain error. Crim.R. 52(B). However, plain error allows for review where a timely objection to an alleged trial court error was never made. Id. In this case, the trial court merely complied with trial counsel's request to have the trial court review potentially inconsistent out-of-court statements of testifying witnesses. The fourth assignment of error is overruled.
Assignment of Error No. 5:
 MEDIA COVERAGE OF CARRIE CULBERSON'S DISAPPEARANCE AND DOAN'S INDICTMENT FOR HER MURDER SO PERMEATED THE CLINTON COUNTY REGION THAT THE TRIAL COURT'S FAILURE TO CHANGE VENUE DENIED DOAN HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR AND IMPARTIAL TRIAL.
In the fifth assignment of error, appellant argues that pretrial publicity deprived appellant of his Sixth Amendment right to an impartial jury trial and as well as his Fifth Amendment right to not be deprived of liberty without due process of law. We disagree.
The disappearance of Culberson, speculation that appellant was the prime suspect and his subsequent arrest, indictment and trial was heavily covered in the local media in and around Clinton County. The record reflects numerous articles concerning the case in the Wilmington News Journal and community newspapers such as the Blanchester Star Republican. In addition, this case was covered in the Cincinnati Enquirer and the Cincinnati Post, both of which circulate in Clinton County. Television coverage of this case from local Dayton and Cincinnati stations permeated Clinton County. The case also apparently received national attention on television programs such as Montel Williams, Inside Edition and Oprah Winfrey.
Appellant moved for a change of venue, which was overruled by the trial court after the completion of the voir dire. Crim.R. 18(B) provides that a change of venue is appropriate where "a fair and impartial trial cannot be held in the court in which the action is pending." R.C. 2901.12(K), a section of the criminal venue statute, contains substantively identical language. The trial court has discretion in determining whether to grant a motion for change of venue and "appellate courts should not disturb the trial court's [venue] ruling * * * unless it is clearly shown that the trial court has abused its discretion." State v.Lundgren (1995), 73 Ohio St.3d 474, 479, citing State v. Maurer
(1984), 15 Ohio St.3d 239, 250.
In "relatively rare" cases, adverse pretrial publicity can be so pervasive that a presumption of prejudice exists. Lundgren at 479, citing Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539,554, 96 S.Ct. 2791, 2800. However, it is settled that "pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial." Nebraska Press Assn. at 2800. Appellant argues the pretrial publicity was so pervasive in the venue of Clinton County that a presumption of prejudice in the jury panel should have been found.
Voir dire is the best method for determining whether, despite pretrial publicity, a fair and impartial jury can be obtained in the local community. Lundgren at 479; State v. Lundrum (1990),53 Ohio St.3d 107, 117. We have carefully reviewed the voir dire. Every member of the jury pool, without exception, which stated he or she was unable to divorce his or her preconceived notions about the case from the evidence presented was dismissed. The overwhelming majority of the jury pool was familiar with the case. However, most of the jury pool could recall little of the television coverage. A typical potential juror had seen appellant's face on television, but could recall nothing he had said on television. We do not believe a presumption of prejudice can be shown in this case. Moreover, as detailed in the seventh assignment of error, the voir dire was appropriately conducted. The trial court acted within its discretion in overruling the motion for a change of venue.[6] The fifth assignment of error is overruled.
Assignment of Error No. 6:
 MISCONDUCT BY THE PROSECUTOR DENIED DOAN'S RIGHTS AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
In the sixth assignment of error, appellant argues that he was denied his constitutional right to a fair trial by prosecutorial misconduct, including (1) introduction of inadmissible "prior acts" evidence and hearsay; (2) improper closing argument; (3) introduction of appellant's "grim reaper" tattoo; (4) introduction of a photograph of Culberson and (5) "miscellaneous misconduct." We address each of these claims in turn.
"The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Smith (2000),87 Ohio St.3d 424, 442. The analysis must be centered on "the fairness of the trial, not the culpability of the prosecutor."Id., citing Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947.
We have already addressed the substantive law concerning the admission of the "other acts" evidence and hearsay statements. Since the second and third assignments of error have been overruled, this argument is not well-taken.
Appellant argues that during closing argument the prosecutor improperly referred to evidence outside the record, asked the jury to speculate and interjected his personal opinion. Since trial counsel did not object to these statements, we review these statements for plain error. Crim.R. 52(B). We must first determine if any of the statements were improper, and, if so, if the statement denied appellant a fair trial. State v. Keenan
(1993), 66 Ohio St.3d 402, 410. "The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." Keenan at 405, quoting State v. Apanovitch (1987), 33 Ohio St.3d 19, 24.
We have reviewed every statement appellant alleges was improper. We find the statements seek to have the jury to draw reasonable inferences from the evidence. The "religious reference" to which appellant refers merely analogizes the historical betrayals of Jesus Christ and Julius Caesar to the betrayal of Culberson by appellant. There is nothing in closing arguments that could possibly be considered plain error. See Crim.R. 52(B).
The admission of the photograph of appellant's "grim reaper" tattoo was not error. The evidence removed any question about Watkins' testimony, which identified appellant being on the deck at the Baker home. Considering appellant's trial counsel attempt to attack Lori Baker's and Watkins' credibility, it was reasonable to allow the prosecution to ensure Watkins' identification was beyond question. Appellant, in this instance and others throughout the trial, sought to stipulate to identification. However, the prosecutor is generally entitled to present relevant, admissible evidence and not enter a stipulation. Finally, a warrant was not required to take the photograph of appellant's tattoo because the photograph was a minor intrusion. See LaFave, Search and Seizure (3ed. 1996) 130-34, Section 5.3(c).
Appellant argues the prosecutor committed misconduct by admitting state exhibit 20, an approximately two-by-three-foot photograph of Culberson after she had been beaten by appellant. The photograph was admitted during the testimony of Debbie Culberson. The photograph was part of the "other act" evidence we have found was properly admitted in evidence. A much smaller photograph was given to the jury for deliberation and probably would have sufficed at trial. Nevertheless, the trial court has wide latitude on such an issue and we find no abuse of discretion. Even assuming the photograph was admitted in error, we do not find the photograph affected the fundamental fairness of the trial.
Appellant lists alleged "miscellaneous misconduct" by the prosecutor. The record indicates the prosecution told the trial court that an out-of-court statement by Vicki Watkins was turned over when discovered. Nothing in the record indicates that the prosecution was deliberately withholding discovery. In any event, the statement was reviewed by the trial court for Crim.R. 16(B)(1)(g) purposes. The failure to turn over the failed voice stress analyzer test given to Watkins had no demonstrable effect on the outcome of the trial. The reference that "Baker women" do what "Baker men" tell them was a reasonable effort, supported by Lori Baker's testimony, to explain why Lori Baker initially did not reveal what she knew about the crime.
We do not find any prosecutorial misconduct that prejudiced the outcome of appellant's trial. The sixth assignment of error is overruled.
Assignment of Error No. 7:
 THE TRIAL COURT ABUSED ITS DISCRETION DURING VOIR DIRE BY NOT REQUESTING QUESTIONS ABOUT PRETRIAL PUBLICITY BE ASKED INDIVIDUALLY AND PERMITTING THE STATEWIDE LATITUDE BUT NOT GIVING THE DEFENSE SIMILAR OPPORTUNITIES. SAID ERRORS DEPRIVED DOAN OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
The trial court has discretion as to how voir dire is conducted. State v. Cornwell (1999), 86 Ohio St.3d 560, 565. Absent an abuse of discretion, the trial court's decision on how to conduct voir dire will not be reversed. Appellant argues the trial court abused its discretion by questioning potential jurors in groups, rather than individually, about pretrial publicity. The voir dire included individual questioning of jurors, but pretrial publicity was not discussed during individual questioning, which centered on the penalty phase of the trial.
Appellant's argument is that, by not individually questioning each potential juror about pretrial publicity, appellant's trial counsel was restricted from asking detailed questioning because counsel risked poisoning other members of the jury pool. However, the Supreme Court of Ohio has held individual questioning of potential jurors is not required in a capital case. State v.Brown (1988), 38 Ohio St.3d 305, paragraph two of the syllabus.
Appellant argues it was error to allow the prosecution more latitude in voir dire than the defense counsel. The prosecution was allowed to review the indictment and the elements of the offenses which were to be at issue during the trial. We find the trial court was within its discretion to allow the prosecutor to review the charges with potential jurors. This review did not include any improper discussion of the evidence. By contrast, defense counsel repeatedly asked jurors if they believed Culberson was alive. This was clearly improper and objections were properly sustained. The comparison appellant seeks to draw is a non sequitur.
Appellant argues that his trial counsel was prevented from asking the jury if they would be unfairly influenced by "other acts" evidence. Having reviewed the portion of the transcript appellant cites in his brief, the trial court never prevented appellant's counsel from asking potential jurors if they would be unfairly influenced by other acts evidence. The question asked by appellant's trial counsel to a potential juror was "if you were on trial and if that is what the charges were wouldn't you want to be tried just on something that happened that day?" The trial court found the question improper because the crime can be "on or about" a certain day. After listening to appellant's trial counsel explanation that he was seeking to question jurors about "other acts" evidence, the trial court sustained an objection because of the phrasing of the question. Appellant's trial counsel decided not to ask further questions on the subject. It is clear appellant's counsel was given the opportunity to ask further questions.
The voir dire was conducted within the sound discretion of the trial court. The decisions rendered by the trial court during voir dire were not unreasonable, unconscionable or arbitrary. The seventh assignment of error is overruled.
Assignment of Error No. 8:
 DOAN WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.
In his eighth assignment of error, appellant argues he was deprived of his constitutional right to the effective assistance of trial counsel. To demonstrate ineffective assistance of counsel, appellant must satisfy a two prong test: (1) show that counsel's representation fell below an objective standard of reasonableness; and (2) show that counsel's actions prejudiced appellant at trial. Strickland v. Washington (1984), 466 U.S. 668,688, 694, 104 S.Ct. 2052, 2064, 2068. Prejudice means "a reasonable probability that, but for counsel's actions, the result of the proceeding would have been different." Id. at 694,104 S.Ct. at 2068. "If it is easier to dispose if an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." State v. Loza (1994), 71 Ohio St.3d 61, 83, citing Strickland at 697, 104 S.Ct. at 2069.
Appellant argues his trial counsel failed to object to the erroneous jury instruction discussed in the first assignment of error before the instruction was read to the jury. However, as we discussed in the first assignment of error, in light of the jury instructions as a whole, the mistake did not prejudice appellant's trial. Loza at 83.
Appellant argues his trial counsel failed to personally review potentially inconsistent out-of-court statements pursuant to Crim.R. 16(B)(1)(g) and instead deferred to the trial court's review. Having reviewed the statements, the trial court's rulings were substantially correct. Therefore, appellant was not prejudiced. Loza at 83. Appellant argues his trial counsel failed to object to prosecutorial misconduct during closing argument. However, we have overruled the sixth assignment of error which addressed alleged prosecutorial misconduct during closing argument.
Appellant argues trial counsel failed to renew a Crim.R. 29 motion at the end of trial and, therefore, this court must review appellant's sufficiency of the evidence assignment of error under a more deferential standard of review. However, as discussed below, we reviewed the tenth assignment of error under the normal sufficiency of the evidence legal standard and found it without merit. There is also no reasonable possibility the motion would have been granted. Therefore, appellant was not prejudiced. Id.
The eighth assignment of error is overruled.
Assignment of Error No. 9:
 DOAN'S CONVICTIONS OF AGGRAVATED (FELONY) MURDER IN COUNT II AND HIS CONVICTIONS OF KIDNAPPING IN COUNTS III, V AND VI ARE AGAINST THE WEIGHT OF THE EVIDENCE.
In the ninth assignment of error, appellant argues his conviction is against the manifest weight of the evidence. The standard for reversal for manifest weight of the evidence has been summarized as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997) 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
In reviewing the trial transcript, a reasonable trier of fact could have concluded, beyond a reasonable doubt, that appellant had abused and threatened to kill Culberson before August 29, 1996. As previously detailed, appellant had a clear motive to control Culberson. Billie Jo Brown's testimony establishes the kidnapping of Culberson. Lori Baker and Watkins' testimony establish appellant arriving at the Baker home wearing only jeans and covered with blood. Appellant then took a shower and he and Tracy Baker left the house with garbage bags and a gun. A reasonable inference is that appellant had murdered Culberson and needed to dispose of the body. After returning at 6:00 a.m., appellant took another shower. A reasonable inference can be drawn here as well.
Appellant made extremely incriminating statements to Lori Baker and Epperson after the crime was committed. The footprints in the lake could be considered an attempt to hide, and later remove, evidence. Appellant's obsessive pattern of calling Culberson at work and the Whittens' business changed the morning after the crime was committed.
The jury was entitled to conclude that the testimony of the several witnesses who identified Culberson after August 29, 1996 lacked credibility. Most of these witnesses seemed influenced by the notorious nature of this case and the accompanying publicity. The police officer's identification, arguably the most credible, was compromised by the failure of Culberson to keep the front license plate on her vehicle. In fact, he testified his original identification must have been mistaken. The jury could reasonably have concluded that the alibi witnesses had an obvious bias as the father and stepmother of appellant.
Overall, the jury was in the best position to evaluate the veracity of all the witnesses and the weight to be given the evidence. We do not find the verdict of this jury amounts to a miscarriage of justice or that the jury lost its way. The ninth assignment of error is overruled.
Assignment of Error No. 10:
 DOAN'S CONVICTIONS OF AGGRAVATED (FELONY) MURDER IN COUNT II AND HIS CONVICTIONS OF KIDNAPPING IN COUNTS III, V AND VI ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.
Sufficiency of evidence tests whether, as a matter of law, there is adequate evidence to support a conviction. Thompkins,78 Ohio St. 3d at 386. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks
(1991) 61 Ohio St.3d 259, 259-60, paragraph two of the syllabus. The test for sufficiency is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
As detailed during discussion of the ninth assignment of error, a review of the trial transcript establishes sufficient evidence for a reasonable trier of fact to find appellant kidnapped and murdered Culberson. Appellant argues that the state of Ohio failed to prove venue. See R.C. 2901.12(H). We disagree. The state of Ohio was required to show at least one element of the crimes was committed in Clinton County beyond a reasonable doubt.Jenks. Having reviewed the record, the evidence is sufficient for a reasonable trier of fact to conclude Culberson was kidnapped in Clinton County on August 29, 1996. We do not believe the jury was required to stack inferences upon inferences to reach this legal conclusion. The tenth assignment of error is overruled.
Assignment of Error No. 11:
 THE COURT OF APPEALS DENIAL OF DOAN'S PAGE EXTENSION AND ABILITY TO REVIEW WITNESS STATEMENTS PURSUANT TO CRIM.R. 16(B)(1)(g), DEPRIVED DOAN OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION, THE RIGHT TO COUNSEL AND EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.
In the eleventh assignment of error, appellant argues this court has denied him due process, equal protection, the right to counsel and effective assistance of appellate counsel by limiting appellant's appellate brief to forty pages (appendix not included) and prohibiting appellate counsel from seeing certain pretrial witness statements. Except by permission of this court, the page limit for an appellate brief is twenty pages. Loc.R. 11. This court granted permission for appellant to file a forty-page brief, but overruled motions for an eighty or sixty-page brief. We find the equal protection argument lacks merit. The Supreme Court of Ohio has repeatedly ruled that reasonable page limits are not a denial of due process. State v. Bonnell (1991), 61 Ohio St.3d 179,185-86. Appellant's claim of ineffective assistance of appellate counsel cannot be raised before the appeal has even been decided. See App.R. 26(B). The eleventh assignment of error is overruled.
YOUNG and WALSH, JJ., concur.
 JUDGMENT ENTRY
The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.
It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas for execution upon this judgment and that a certified copy of this Judgment Entry shall constitute the mandate pursuant to App.R. 27.
Costs to be taxed in compliance with App.R. 24.
Stephen W. Powell, Presiding Judge
William W. Young, Judge
James E. Walsh, Judge
[1] 1. The first count was for violation of R.C. 2903.01(A), which states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." The second count was for violation of R.C. 2903.01(B), which states that "[n]o person shall purposely cause the death of another * * * while committing * * * kidnapping * * *."
[2] The first count had two death penalty specifications. The first was "[t]he offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." R.C. 2929.04(A)(3). The second was "[t]he victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding * * * *." R.C. 2929.04(A)(8). The second count had three specifications, the two previously cited as well as R.C.2929.04(A)(7), "[t]he offense was committed while the offender was committing * * * kidnapping, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."
[3] 3. Two of the kidnapping counts in the indictment were "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * To terrorize, or to inflict serious physical harm on the victim or another; * * * To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of a government authority. R.C. 2905.01(A)(3) and (5). The other two counts were "[n]o person, by force, threat or deception * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * * under circumstances that either creates a substantial risk of serious physical harm to the victim or cause physical harm to the victim: Remove another from the place where the other person is found; Restrain another in his liberty[.]" R.C. 2905.01(B)(1) and (2).
[4] 4. The Sixth Amendment of the United States Constitution states that "[I]n all criminal prosecutions, the accused shall enjoy the right to * * * be confronted with the witnesses against him * * *."
[5] The Supreme Court of Ohio did depart from the White holding in State v. Storch (1993), 66 Ohio St.3d 280, on the basis of Section 10, Article I of the Ohio Constitution, which contains an analogous confrontation clause provision to the Sixth Amendment.Storch ruled that, in child abuse cases, the trial court should determine whether a child can testify, i.e., is "unavailable," before admitting out-of-court statements by an alleged victim of child abuse. Storch at paragraph two of syllabus. The court found Evid.R. 807, enacted subsequent to the trial in Storch, consistent with the requirements of the Ohio Constitution. Since unavailability is not an issue in this case, the confrontation clauses of both the Ohio and federal constitutions are satisfied by an out-of-court statement falling under a "firmly rooted" hearsay exception. See Weissenberger's Ohio Evidence (1999) 353-54, Section 801.2.
[6] 6. Appellant argues de novo review is appropriate because the trial court never formally overruled appellant's motion. Absent a ruling, we presume the motion is overruled. See, e.g.,State ex rel. Forsyth v. Brigner (1999), 86 Ohio St.3d 299, 300. In any event, assuming de novo review, our decision would be the same.