OPINION
Defendant-appellant, Johnnie Hall, appeals from his conviction and sentence for Felonious Assault. Hall contends that the trial court abused its discretion by denying his request for a jury view of the scene of the alleged offense, and that the trial court erred by refusing to permit him to review records of the complaining witness' hospitalization in 1994, following a suicide attempt. Hall's reason for requesting the jury view of the scene is that the layout of the residence where the offense allegedly occurred would support his contention that the victim, Gwendolyn Barnes, could have retreated from his alleged assault, thereby rendering her accusation less credible. We agree with the State that the trial court did not abuse its discretion in denying the request to view the scene. The apartment in which the assault allegedly occurred had been re-let to someone else; Hall was allowed to use a floor-plan of the apartment in cross-examining Barnes; and Barnes readily admitted that she could have fled from the assault. Accordingly, the trial court did not abuse its discretion by denying the request for a view of the scene.
Like the trial court, we have reviewed, in camera, the medical records of the victim's 1994 hospitalization. We agree with the trial court's conclusion that these records are privileged, and that they are not material to Hall's defense. They do no more than corroborate the victim's trial testimony that she had attempted to commit suicide in 1994, by an overdose of prescribed medication.
Neither of Hall's assignments of error having merit, the judgment of the trial court is Affirmed.
 I
One evening in June, 2000, Gwendolyn Barnes was sitting in the living room of the apartment she shared with Johnnie Hall. She was curling her hair with a curling iron. She got something in her eye, and went outside. While outside, in the middle of the parking lot, she saw Hall's car pulling around the corner. She ran back into the apartment, but it was too late — Hall had seen her outside. Barnes was not supposed to be outside without Hall's permission.
When Hall entered the apartment, he informed Barnes that she would have to be punished for being outside without his permission. He grabbed the curling iron, and burned Barnes on the right side of her face and neck. Barnes started crawling across the floor, trying to get away, but Hall followed her and burned her again on the back of her neck. By this time, Barnes and Hall were in the kitchen of the apartment. Hall took a clothes iron off the kitchen table and plugged it in. While the iron was heating, Hall ordered Barnes to take off her clothes, and then gave her the choice of being burned by the iron or being electrocuted by sticking her hand into the dishwasher "so he could throw the iron into it." Barnes refused the electrocution option. Hall then ordered Barnes to lie on the floor and burned her, with the clothes iron, on her stomach and on her back. He then made her lie on the floor with her legs up in the air, "like we were having sex," and kicked her between the legs until she started bleeding. He then poured rubbing alcohol and sprayed spray starch where she was bleeding.
The next day, Barnes' supervisor at work noticed an open wound on the back of her neck, and sent her to the hospital for treatment. After leaving the hospital, Barnes was seen by a domestic violence care center. Hall was arrested and charged with Felonious Assault.
Before trial, Hall moved to obtain Barnes' medical records pertaining to her hospital admission in 1994, involving "an alleged suicide attempt by complainant." Hall asserted that the medical records might provide proof relating to Barnes' "mental instability, negative credibility, suicidal tendencies, or tendencies to self-immolate." The trial court reviewed these records in camera, denied the motion to make them available to Hall, and ordered them maintained under seal. The trial court also denied a pre-trial motion for a jury view of the scene.
During the trial, Barnes testified, and acknowledged, during cross-examination, that she was hospitalized in 1994 as a result of an attempt to commit suicide by an overdose of prescribed medications. Also during trial, the trial court renewed its decision not to make the 1994 medical records available:
 The court previously, at the request of the defendant, did obtain the 1994 record from Good Samaritan Hospital, and a decision of November 28 indicated that the court had reviewed them in camera, found them not to be appropriate or relevant, or, if relevant, their prejudicial value far outweighs any probative value and that they contained privileged and confidential information and for other reasons would not disclose them.
 The court, as recently as yesterday, again reviewed — unsealed them from myself and reviewed them again and sealed them back up, and reiterates its ruling now, having heard the testimony and is making the same findings and will stand by its previous sustaining of the objection concerning the children of the complainant and their involvement with CSB.
Following a jury trial, Hall was convicted of Felonious Assault and sentenced accordingly. From his conviction and sentence, Hall appeals.
 II
Hall's First Assignment of Error is as follows:
 THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S REQUEST FOR A JURY VIEW.
In support of this assignment of error, Hall argues as follows:
 In the instance case, Appellant made it clear to the court that one of his primary defenses was Appellant's contention that Barnes could have fled the scene at any time. A key element of Appellant's defense was, therefore, a clear understanding on the part of the jury of the actual physical layout of the apartment. A drawing or diagram of the apartment is clearly insufficient for this purpose. This is especially true due to the State's "serious reservation" in connection with Barnes' ability to testify accurately from a drawing or diagram. Under these circumstances, the trial court erred by denying appellant's request to view the actual premises.
Like the State, we initially read this argument as asserting that Hall wanted to use the jury view of the scene to bolster a defense that Barnes could have retreated. We agree with the State that the fact that a victim of an assault could have retreated is no defense to a charge of assault.
At oral argument, it became clear that Hall actually wanted to challenge the credibility of Barnes' accusation by showing that she could have retreated from the alleged assault by fleeing from the apartment she shared with Hall. Hall wanted to argue to the jury that if he had really assaulted Barnes in the horrific manner that she described, she would not have endured it, but would have fled. Hall argues that a jury view of the scene would have aided his presentation of this argument to the jury.
Hall recognizes that a trial court "has a vast amount of discretion in determining whether or not to grant a jury view request." Hall's brief, at 5, citing State v. Lundgren (1995), 73 Ohio St.3d 474. Although we cannot find that part of the opinion in Lundgren that supports the proposition, we agree with it. Calloway v. Maxwell (1965), 2 Ohio St.2d 128, also cited by Hall, holds that the determination whether a jury should view the premises where the crime occurred lies within the trial court's "sound discretion," although it does not characterize that discretion as "vast."
In our view, the trial court in the case before us did not abuse its discretion when it denied the motion for a jury view of the scene. The apartment in which the assault allegedly occurred had been re-let to someone else, so the jury would not, in any event, have been able to see the interior of the apartment as it existed at the time of the alleged assault. The present occupant was not known to either party, a fact of which the trial court evidently became aware only when the motion was made after the jury had been selected, making a view of the scene at the customary time — before the commencement of testimony — difficult, if not impossible. (We are not saying that a view of the scene can never occur after the taking of testimony has commenced — just that it is not customary to do so.) Hall was permitted to use a schematic diagram of the apartment in cross-examining Barnes. Finally, and most importantly, Barnes admitted readily that she was not restrained and could have left the apartment after the assault commenced against her:
 Q. All right. You tell me he came to the living — into the apartment and burned you with the curling iron. Correct?
A. Correct.
Q. Then where did you go next?
 A. When he came into the apartment into the living room, I was sitting on the floor. He picked up the curler and he burned me. I fell back with my arms into the fence and he made me go into the kitchen.
Q. So you went into the kitchen.
A. M-hum.
 Q. Now, there's no obstruction between the kitchen and the outside door. Correct?
A. I don't understand.
 Q. There's no encroachment, there's no doorway, there's nothing to stop you from getting out except the door.
A. Correct.
 Q. Okay. So everything that Johnnie Hall allegedly did to you while you were in the apartment was done — this is the question — without any restraints, physical restraints. Correct? You've answered that already.
A. Correct.
 Q. Okay. And later when Johnnie, according to you, drove you to your mother's house — I'm sorry, his mother's house, he left you in the car while he went in. Correct?
A. Correct.
Q. And you were not tied up or bound or restrained at all.
A. Correct.
 Q. And then he came back sometime thereafter and drove you back to the apartment, and you — for whatever time that was, and you stayed at the apartment. Then you spent — the two of you, according to your story, spent the remainder of the night at that apartment. Correct?
A. Correct.
We conclude that the trial court did not abuse its discretion in denying Hall's request for a jury view of the scene. The point that Hall was trying to make — that Barnes could have fled from his alleged assault upon her — was made in his cross-examination of her, the record reflects that a schematic of the apartment was being projected on a screen for the jury to see during the cross-examination, and the exact layout of the apartment at the time of the offense could not be recreated in view of the intervening letting of the apartment to someone else.
Hall's First Assignment of Error is overruled.
 III
Hall's Second Assignment of Error is as follows:
 THE TRIAL COURT ERRED BY FAILING TO VIEW BARNES' MEDICAL RECORDS IN REGARDS TO HER 1994 HOSPITALIZATION.
Hall recognizes that Barnes' medical records are privileged under Ohio law. Nevertheless, he relies upon Pennsylvania v. Ritchie (1987),480 U.S. 39, 107 S. Ct. 99, 94 L.Ed.2d 40, for the proposition that "the trial court has a duty to conduct an in-camera inspection of such medical records to determine whether the information contained therein is material to the defense of the accused." (Emphasis in Hall's brief.) We entertain some doubt whether Ritchie applies at all to the case before us. In Ritchie, the issue was whether the Commonwealth of Pennsylvania, in a criminal prosecution, was required, under some circumstances, to make available to the defendant privileged medical records in its own possession. Good Samaritan Hospital, the custodian of the records sought in the case before us, is not an instrumentality of the State of Ohio.
Nevertheless, assuming, for purposes of analysis, that the holding in Pennsylvania v. Ritchie applies to the case before us, we conclude that the trial court did not err when it determined that these records are not material to Hall's defense. In that connection, we note that the test articulated in Pennsylvania v. Ritchie for materiality is: "whether [the records] contain information that probably would have changed the outcome of [the] trial." Id., at 480 U.S. 58, 107 S.Ct. 1002.
Like the trial court, we have reviewed the Good Samaritan Hospital records in camera. They do no more than corroborate Barnes' testimony, at trial during cross-examination, that she attempted to commit suicide in 1994 by an overdose of prescribed medication, and was hospitalized as a result. The hospital records would have added nothing to this point.
Evidently, Hall was attempting to make the argument that because Barnes had attempted to commit suicide in 1994, by means of a drug overdose, that supported his theory that her injuries on June 20, 2000, were self-inflicted. The jury was apparently being asked to believe that Barnes was once again attempting to take her own life, this time by burning herself with a curling iron and a clothes iron, and possibly also by blunt trauma to her genital area. We find it unsurprising that the jury was not persuaded by this theory.
In any event, Barnes' 1994 Good Samaritan Hospital records, the privileged nature of which Hall does not question, could not have added one iota to this theory of defense.
Accordingly, we conclude that the trial court did not err in denying Hall's motion that these records be made available to him. Even if the trial court had erred in that regard, that error was harmless beyond a reasonable doubt.
Hall's Second Assignment of Error is overruled.
 IV
Both of Hall's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and YOUNG, J.J., concur.